158 F.3d 65
 1999 A.M.C. 609
 In re: PRUDENTIAL LINES INC., Debtor.
Lee J. DICOLA, Trustee of the PLI Disbursement Trust, Plaintiff,
Asbestosis Claimants Represented by the Maritime Asbestosis
Legal Clinic,
Intervenors-Plaintiffs-Appellants-Cross-Appellees,
v.
AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY
ASSOCIATION, INC., Defendant-Appellee-Cross-Appellant.
 Docket Nos. 97-5045, 97-5053.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 12, 1998.
Decided Oct. 5, 1998.
 
 Alan Kellman, Detroit, MI (Leonard C. Jaques, The Maritime Asbestosis Legal Clinic, on the brief), for Intervenors-Plaintiffs-Appellants-Cross-Appellees.
 Richard H. Brown, Jr., New York, NY (Kirlin, Campbell & Keating, James M. Maloney, Christy & Viener, on the brief), for Defendant-Appellee-Cross-Appellant.
 Before: VAN GRAAFEILAND, JACOBS and LAY,* Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 The Trustee of a shipping line in bankruptcy, Prudential Lines, Inc., sued Prudential's insurer, American Steamship Owners Mutual Protection and Indemnity Association ("American Club"), seeking declaratory relief clarifying American Club's indemnity obligations for asbestos-related bodily injury claims asserted against Prudential; the asbestosis claimants (the "Claimants") intervened. The issues contested on this appeal arise under the pay first provision; the deductible provision; and the clauses governing indemnity and other insurance.
 
 
 2
 The Pay First Provision. The American Club policies contain a pay first provision requiring that Prudential pay any claims prior to seeking indemnification from American Club. However, bankrupt Prudential lacks the funds to pay the claims. In an effort to satisfy the Claimants and the pay first provision, the reorganization plan set aside $300,000 for use in a recycling arrangement: seriatim, the Trustee disbursed a damages payment to each Claimant, who then returned the money to the Trustee as a non-recourse loan so that it would be on hand to pay the next Claimant, and so on. The United States Bankruptcy Court for the Southern District of New York (Conrad, J.) found that this arrangement satisfied the pay first provision. See In re Prudential Lines, Inc., 148 B.R. 730, 750 (Bankr.S.D.N.Y.1992) ("Prudential I "). The district court reversed on the ground that the loan arrangement resulted in no monetary loss to the insured and was a sham. See In re Prudential Lines, Inc., 170 B.R. 222, 242 (S.D.N.Y.1994) ("Prudential II "). The Claimants appeal this ruling.
 
 
 3
 The Deductible Provision. The American Club policies require the policyholder to pay one deductible "per occurrence." The bankruptcy court held that all asbestos-related bodily injury claims resulting from exposure to asbestos aboard one ship arose from a single occurrence--the presence of asbestos aboard the ship during the policy period--so that a single deductible satisfies the deductible provision with respect to all of those claims. See Prudential I, 148 B.R. at 747; In re Prudential Lines, Inc., 202 B.R. 13, 24 (Bankr.S.D.N.Y.1996) (Gonzalez, B.J.) ("Prudential III "). The district court reversed, holding that the parties in their course of dealing had attached a practical construction to the deductible provision under which each asbestos bodily injury claim is subject to one deductible. See In re Prudential Lines, Inc., 209 B.R. 621, 626 (S.D.N.Y.1997) ("Prudential IV "). The Claimants appeal this ruling.
 
 
 4
 The Indemnity and Other Insurance Clauses. American Club argues that when more than one of its policies is triggered by a single loss, the policyholder is entitled to no more than a fractional recovery under each policy. The bankruptcy court held that once triggered by injury-in-fact, each policy was liable for all damages resulting from asbestos exposure, and liability would not be allocated among all triggered policies (although allocation through a contribution action might be permissible). See Prudential I, 148 B.R. at 744-45. The district court affirmed. See Prudential II, 170 B.R. at 235. American Club cross-appeals from this ruling.
 
 
 5
 As to each issue, we affirm the judgment of the district court.
 
 BACKGROUND
 
 6
 American Club is a nonprofit mutual insurance association of shipowners that writes protection and indemnity ("P & I") insurance for its shipowner members. Prudential was a member of American Club and a policyholder from 1940 to 1970 and from 1975 to 1986. In early 1986, Prudential filed a bankruptcy petition under Chapter 11.
 
 
 7
 Over the past 15 years, approximately 5,000 Claimants have alleged that they suffered asbestos-related bodily injuries by exposure to asbestos while working aboard Prudential's ships, and have sought damages from Prudential for negligence under the Jones Act, 46 U.S.C. § 688 et seq., and for unseaworthiness under the general maritime law.
 
 
 8
 Each P & I contract is written for a one-year policy period, and provides in the indemnity clause (in pertinent part) that American Club will
 
 
 9
 indemnify the assured against any loss, damage or expense which the assured shall become liable to pay and shall pay by reason of the fact that the assured is the owner (or operator, ... as the case may be) of the insured vessel and which shall result from the following liabilities[,] risks[,] events[,] occurrences and expenditures:
 
 
 10
 (1) Liability for ... personal injury to, or illness of any person....
 
 
 11
 (emphasis added). The import of the emphasized wording is that Prudential must first pay any claims or judgments against it before obtaining indemnification from American Club. The lack of sufficient funds on hand at the time of Prudential's bankruptcy made outright payment of the claims impossible, so Prudential and its Trustee took the following measures.
 
 
 12
 The Second Amended Joint Plan of Reorganization (the "Plan"), confirmed in 1990, creates a Prudential Disbursement Trust to resolve asbestos-related claims and to enforce the trust's interests against Prudential's insurers. Section 4.05.07 of the Plan sets aside $300,000 to be used by the Trustee to engage in certain loan arrangements for the replenishment of deductibles:
 
 
 13
 [T]he [Prudential] Disbursement Trustee is authorized to enter into arrangements under which in substance the [Prudential] Disbursement Trust pays the Allowed Insured Claim in full in cash; the holder of the Allowed Insured Claim repays in cash the full amount of the Deductible Claim and the Club or other insurer reimburses the [Prudential] Disbursement Trust in cash for the full amount of the Excess Claim ...; and the holder of the Allowed Insured Claim is given an Allowed Claim in Class 5C in the amount of the Deductible Claim.... The ... Trustee may alternatively enter into any lawful arrangement designed to achieve the same purpose, as may be agreed upon by the holder of an Allowed Insured Claim and the ... Trustee, but ... may not use funds of the ... Trust ... unless adequate assurances and documentation are provided ensuring that the ... Trust will promptly receive repayment and/or reimbursement of all amounts paid by the ... Trust.
 
 
 14
 (emphasis added).
 
 
 15
 In December 1990, the Prudential Trustee commenced this suit against American Club, seeking a declaration of Prudential's rights under the American Club policies; the Claimants intervened. The bankruptcy court determined that the action was a core proceeding. Prudential I, 148 B.R. at 735. In December 1992, in response to cross-motions for summary judgment, the bankruptcy court decided the deductible and allocation issues. American Club appealed those decisions to the district court.
 
 
 16
 In March 1993, the Prudential Trustee and the Claimants agreed inter se to a Stipulation and Settlement Agreement determining Prudential's liability to the Claimants and authorizing an arrangement for recycling Prudential's $300,000 cash fund as required to satisfy the claims. Under this arrangement, the Trustee would pay Claimant A in cash from the $300,000 set aside under the Plan, and Claimant A immediately would loan the funds back to the bankrupt estate via a non-recourse loan. The replenished fund would then be used to compensate Claimant B, and so on.[1]
 
 
 17
 The bankruptcy court "so ordered" the Stipulation and Settlement Agreement on March 9, 1993, and the Trustee recycled the $300,000 over and over until the Trustee owed $13 million to the Claimants on non-recourse loans. On August 4, 1993, the bankruptcy court ordered American Club to indemnify Prudential for the $13 million. The wheels continued turning, and on September 27, 1993, the bankruptcy court entered a partial judgment requiring that American Club indemnify Prudential for $66.16 million in such claims. American Club appealed those orders. (The bankruptcy court did not permit American Club to conduct discovery as to the reasonableness of these settlements, or actually determine for itself whether the settlements with the Claimants were reasonable. See infra note 2.)
 
 
 18
 On July 29, 1994, the district court (i) reversed the bankruptcy court, holding that the recycling did not satisfy the pay first provision of American Club's policy; (ii) reversed the bankruptcy court's determination on the deductible issue, holding that the term "occurrence," as used in relation to the policy deductible, was ambiguous, and remanding to the bankruptcy court to determine whether extrinsic evidence of practical construction supplied meaning to that term; and (iii) affirmed the bankruptcy court on the allocation issue. American Club then appealed the deductible and allocation issues to this Court, claiming that these issues were ripe for appeal. In addition, the Claimants moved for an interlocutory appeal of the pay first issue pursuant to 28 U.S.C. § 1292(b).
 
 
 19
 On December 6, 1994--before the appeal was heard in this Court--the bankruptcy court issued an order vacating the Stipulation and Settlement Agreement in light of the district court's rejection of the recycling arrangement.
 
 
 20
 On June 26, 1995, we dismissed American Club's appeal, and denied the Claimants' motion for interlocutory appeal, finding that: (i) the appeals on the deductible and allocation issues were not ripe because they did not amount to final orders or judgments in light of the district court's remand of the deductible issue; and (ii) the appeal of the pay first issue, although certified by the district court, was better heard at the completion of the bankruptcy proceedings. See In re Prudential Lines, Inc., 59 F.3d 327, 332 (2d Cir.1995).
 
 
 21
 Pursuant to the terms of the remand, the bankruptcy court conducted an evidentiary hearing on the parties' practical construction (if any) of the deductible provision. On November 5, 1996, the bankruptcy court found that American Club had failed to prove that Prudential acquiesced to American Club's practice of applying a single deductible per asbestosis claim per policy. In June 1997, the district court concluded that this finding was clearly erroneous, and reversed.
 
 DISCUSSION
 
 22
 The Claimants appeal the district court's ruling on the pay first and deductible issues; American Club cross-appeals the district court's ruling on the allocation issue.
 
 
 23
 There are two threshold issues.
 
 
 24
 1. American Club argues that: (i) the Claimants failed to appeal the bankruptcy court's December 6, 1994 order vacating the 1993 Stipulation and Settlement Agreement (which created the recycling arrangement); (ii) this order vacated the Stipulation and Settlement Agreement for reasons other than the district court's ruling on the recycling; and (iii) therefore there is no viable recycling arrangement that could be implemented even if we were to reverse.
 
 
 25
 A declaratory judgment action presents an actual controversy if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Where the contingent event upon which the controversy rests is unlikely to occur, the controversy lacks "sufficient immediacy and reality" to warrant declaratory relief. See, e.g., Certain Underwriters at Lloyd's v. St. Joe Minerals Corp., 90 F.3d 671, 675 (2d Cir.1996) (finding declaratory judgment action relating to excess insurance coverage not ripe when, inter alia, there was no practical likelihood that liability would reach excess insurance layers).
 
 
 26
 We think that the pay first issue continues to present a controversy that is immediate and real. The second premise of American Club's argument is wrong; the bankruptcy court vacated the Stipulation and Settlement Agreement solely because of the district court's decision on the pay first issue, not for other reasons, and therefore a decision favorable to the Claimants on the pay first issue could realistically lead to reinstatement of the Stipulation and Settlement Agreement and its recycling arrangement.[2] Moreover, the Claimants properly preserved their appeal of the district court's ruling on the pay first issue: They sought an interlocutory appeal pursuant to § 1292(b), and when that appeal was dismissed as premature, they waited until all issues were final and filed a notice of appeal from the district court's pay first ruling. We have no reason to think that if we were to find error in the district court's determination, the Stipulation and Settlement Agreement could not be reinstated (subject to a fairness hearing on other aspects of the settlement).
 
 
 27
 2. The conclusion we reach infra on the pay first issue means that the recycling arrangement created by the Stipulation and Settlement Agreement cannot be used to trigger American Club's indemnification obligations. We must therefore consider whether this opinion need decide the remaining issues concerning the deductible and the allocation of damages among triggered policies. The answer turns on whether a payment mechanism other than the recycling arrangement is available which renders these issues of sufficient immediacy and reality so as to justify declaratory relief.
 
 
 28
 At oral argument, the parties agreed that there are other available mechanisms (albeit less efficient) for triggering American Club's indemnification obligations. The Claimants suggested specifically that the $300,000 set aside to fund the recycling could be used to settle individual claims. American Club did not contest the availability of those funds for this purpose, and we do not read the reorganization plan to preclude such use. See Plan, § 4.05.07(a)(i) ("[T]he bankruptcy court upon proper motion may authorize the use of such funds for other purposes in connection with efforts to liquidate Personal Injury Claims ...."); see also id. § 4.05.07(v). Given the availability of other payment mechanisms, the deductible issue and the allocation issue are of sufficient immediacy and reality to warrant declaratory judgment.
 
 
 29
 We therefore reach and decide each of the questions presented to us.
 
 I. THE PAY FIRST PROVISION
 
 30
 We agree with Judge Haight's conclusion that the recycling arrangement did not amount to payment under American Club's policy and thus failed to satisfy the policy's pay first provision. The American Club policies require it to "indemnify [Prudential] against any loss, damage or expense which [Prudential] shall become liable to pay and shall pay." Because the American Club policy mandates payment prior to triggering the insurer's indemnification obligations, it is an indemnity policy.
 
 
 31
 Federal maritime law, which applies to this essentially maritime contract, does not speak to the issue of what constitutes payment under an indemnity policy. See Liman v. American Steamship Owners Mut. Protection and Indem. Ass'n, 299 F.Supp. 106, 108 (S.D.N.Y.1969), aff'd, 417 F.2d 627 (2d Cir.1969) (per curiam ). Because we see no need for a uniform federal rule (and because the parties have agreed that New York law governs), we apply New York law.[3] See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 316-17, 75 S.Ct. 368, 372, 99 L.Ed. 337 (1955).
 
 A. Liman v. American Steamship Owners
 
 32
 The recycling arrangement is patterned after a similar device approved by this court in Liman, which involved an identical American Club policy. In Liman, approximately 120 claims were presented by seamen and longshoremen against a bankrupt shipping company. Although the shipping company had sufficient funds to pay the claims, and although there was no reason to doubt that the company would be indemnified eventually by the insurer (net of the deductible), the Government (the bankrupt's chief creditor) opposed payment of the claims as illegal preferences because "the estate would be diminished to the extent of the $1000 deductible which would be attributed to each of the claims to be defended." Liman, 299 F.Supp. at 107.[4] The district court in Liman described the financing mechanism adopted to obviate that objection:
 
 
 33
 The Trustee therefore propos[ed] to finance the $1,000 deductible in each case by defending each lawsuit pursuant to an agreement with the claimant to the effect that in the event of recovery or settlement in an amount in excess of $1,000, the estate will pay the full amount of the recovery to the claimant and the claimant will thereupon repay $1,000 to the estate, in exchange for which the claimant will become a general creditor of the estate in the sum of $1,000.
 
 
 34
 Id. at 108. The insurer objected that "in order to be indemnified under the policies the estate must show that it actually 'absorbed' the $1,000 deductible." Id.
 
 
 35
 Liman summarized New York law on what constitutes payment under an indemnity policy (an interpretation which we adopted in our per curiam opinion affirming on the district court's opinion): "[T]he test in New York is whether the assured has actually in good faith sustained the loss for which reimbursement is sought, and the insurer's obligation to indemnify may not be avoided because of the assured's insolvency." Id. at 109. Thus, an indemnifiable payment entails (i) satisfaction of the claim and (ii) the absorption of some loss thereby by the insured, (iii) both in good faith. See also Ahmed v. American Steamship Mut. Protection & Indem. Ass'n, 640 F.2d 993, 995 (9th Cir.1981) (noting that under New York law an insurer's obligation to pay under an indemnity policy "does not arise until after the insured suffers an actual monetary loss"); 8 John Alan Appleman & Jean Appleman, Insurance Law and Practice § 4856, at 519 (1981) (hereinafter "Appleman") ("[I]n an action upon an indemnity policy, not only must a judgment have first been recovered against the insured ... but it must also appear that the insured has suffered an actual monetary loss or damage.").
 
 
 36
 In holding that the deductible financing arrangement amounted to payment under this standard, the Liman court focused on the use of the challenged arrangement only to finance the deductible, the rest of each claim representing a cash loss out of pocket. Liman, 299 F.Supp. at 109-10. The court reasoned that: (i) the purpose of the deductible is "to enable the insurer to avoid responsibility for small claims which are usually both numerous and costly" and this purpose was not undermined by the arrangement; (ii) the source of the funds for paying the deductible is of no concern to the insurer because the insurer is not required to reimburse the policyholder for the deductible; (iii) other than the financing of the deductible, "the Trustee would satisfy each judgment against the estate and actually pay out of the estate to the claimant all funds for which reimbursement will be sought from defendant," id. at 110; and (iv) given these factors, a failure to find that the insured had paid the claims would permit the insurer to reap a windfall and "to take advantage of the financial status of its insured and deprive the ultimate beneficiary claimant of his judgment," id. at 109. Thus the court found that the purpose of the deductible in that case would be served, and that "the Trustee would be seeking reimbursement only for losses actually sustained by the estate." Id. The court distinguished cases in which recovery on an indemnity policy was denied because in such cases "there was neither a bona fide settlement of judgment obtained by the claimant against the assured nor a payment made by the assured of the amount for which reimbursement was claimed." Id. at 110.
 
 
 37
 Here, Prudential seeks to use the recycling arrangement to finance the whole of the claims, not the deductibles alone. This case thus differs from Liman in the essential respect that indemnity is sought for a loss that the policyholder has not incurred. See Ahmed v. American Steamship Owners Mut. Protection & Indem. Ass'n, 444 F.Supp. 569, 572 (N.D.Cal.1978) (distinguishing Liman by noting that "the insured has never paid any of the claims against it or arranged to finance such payments"), aff'd in part, remanded in part, 640 F.2d 993, 995 (9th Cir.1981).
 
 B. Applying New York Law
 
 38
 As Liman notes, "the test in New York is whether the assured has actually in good faith sustained the loss for which reimbursement is sought." 299 F.Supp. at 109. The only detriment assumed by Prudential vis-a-vis each Claimant is a wholly non-recourse debt, which in financial terms is--and is intended to be--nothing.
 
 
 39
 The Fifth Circuit has concluded that "Liman does not stand for the proposition that 'payment' can be made by the use of a promissory note worthless from the day it is executed." Conoco, Inc. v. Republic Ins. Co., 819 F.2d 120, 122 (5th Cir.1987). Conoco had paid the salvage cost of raising a vessel that sank while on charter from the shipowner, Bonanza. Conoco was unable to recover the salvage cost directly from an insurer that had issued a policy protecting the ship and naming both Bonanza and Conoco as assureds because (as the Fifth Circuit held sitting in banc in a prior case) Conoco had no obligation to perform the salvage operation. Trying again, Conoco arranged for Bonanza (which presumably was obliged to pay the salvage costs of its vessel) to execute a demand promissory note in Conoco's favor for the salvage costs, secured by an assignment of any policy proceeds recovered from the insurer. Bonanza sought indemnification from the insurer on the theory that the note was payment under the policy. Id. at 121. However, "[a]t the time [the loan] documents were signed, [Conoco] assured Bonanza's president that it would not attempt to collect the promissory note." Id. The court held that the bankrupt's satisfaction of the claim with a non-recourse note did not amount to payment under the indemnification policy:Since the bankrupt assured in Liman was not completely bereft of assets, the Liman court was not faced with the situation we face in this case, where Bonanza is literally incapable of sustaining a loss.... Bonanza not only had no intention of paying the promissory note, but offered no hope of eventually providing any value at all in exchange for the note. The company was dormant. Bonanza was gone, and it was not coming back.
 
 
 40
 Id. at 122-23.
 
 
 41
 Prudential is blocked by the same obstacle in this suit. The underlying claims were satisfied with non-recourse notes that entail for Prudential no actual loss incurred in good faith. The only difference between the present case and Conoco is that here Prudential issues boomerang payments from the $300,000 account. But as these funds immediately came home, the Asbestosis Claimants received nothing of value from Prudential, and Prudential sustained no true loss. We do not think that this sham transaction triggered an indemnification obligation under New York law.
 
 
 42
 C. Direct Actions by Claimants Against Marine Indemnity Insurers
 
 
 43
 It is obvious for reasons previously stated that the Claimants are the only parties with an interest in the indemnification from American Club. Our holding is therefore independently supported by the doctrine of New York law that bars direct actions by claimants against marine indemnity insurers. See Ahmed, 444 F.Supp. at 572 ("Under New York common law, an insurer under an indemnity insurance policy is not liable to an injured person who has obtained a judgment against the insured even though the insured is insolvent and cannot pay the judgment."). Although New York has broadly altered this common law rule by statute, the statute expressly preserves application of the common law rule to marine insurance contracts, such as P & I policies. See N.Y. Insur. Law § 3420(i) (McKinney 1985) (referencing § 2117(b)(3) which incorporates marine insurance contracts); Ahmed, 640 F.2d at 995-96. "The exception was consciously made by the New York legislature to eliminate a perceived competitive disadvantage to which New York's marine insurers were placed by the direct action statute." Miller v. American Steamship Owners Mut. Protection and Indem. Co., 509 F.Supp. 1047, 1049 (S.D.N.Y.1981).
 
 
 44
 We have previously barred a suit by an insured's judgment creditor against a marine policy on the ground that the suit closely resembled a direct action. See Wabco Trade Co. v. S.S. Inger Skou, 663 F.2d 369, 371 (2d Cir.1981) (holding that N.Y. C.P.L.R. § 5201(a), which provides for a money judgment against "any debt," affords no basis for maintaining a direct action against a marine insurer of a judgment debtor); see also Cowan v. Continental Ins. Co., 86 A.D.2d 646, 647, 446 N.Y.S.2d 412, 414 (2d Dep't 1982) (noting that judgment creditor of insured could not bring declaratory judgment against insured's insurer). We will not permit the Claimants, who are the only parties in interest, to evade this bar via an illusory transaction that is of no financial consequence or interest to Prudential as the supposed insured.
 
 
 45
 New York's approach to insolvent insureds under the common law rule barring direct actions is quite categorical and firm in terms of the type of actual loss required to trigger an indemnification obligation:
 
 
 46
 [I]f the insured was insolvent, so that the person injured or the estate of one killed was unable to satisfy the judgment against him, the insurer in effect would be released. The policy being one of indemnity against loss suffered by the principal, it followed that the insured having suffered no damage, there was no loss for the insurer to indemnify.
 
 
 47
 Jackson v. Citizens Cas. Co., 277 N.Y. 385, 389, 14 N.E.2d 446 (1938); see 175 East 74th Corp. v. Hartford Accident & Indem. Co., 51 N.Y.2d 585, 591, 435 N.Y.S.2d 584, 586, 416 N.E.2d 584 (1980) ("The insolvency or bankruptcy of an insured, which prevented payment, necessarily relieved the insurer of any obligation to the insured and the injured party was left without a source of recovery."); see also In re F.O. Baroff Co., 555 F.2d 38, 41 (2d Cir.1977) (noting that prior to the enactment of the direct action statute, "courts held that in the event of his bankruptcy, the insured, although liable to a third person, suffered no loss since he was unable to pay the one he had injured. Because the insured had not sustained a loss, the insurance company had no liability to the insured."). Thus, as the law stood under New York common law--and as it still stands in relation to marine insurance policies--the insured's lack of assets to satisfy claims against the bankrupt estate typically leaves the insured unable sustain a loss and pay the claim. This is simply one consequence of purchasing a marine policy of indemnity rather than a liability policy.
 
 D. The Authorities Cited by the Claimants
 
 48
 The several New York cases upon which claimants rely either support our conclusion or are distinguishable. In Campbell v. London & Lancashire Indemnity Co., 168 N.Y.S. 300 (N.Y.Sup. 1917), the insured under an indemnity policy, being insolvent, paid a claim with funds borrowed for that purpose from a third party, secured initially by a promissory note, and later (after the funds were used to pay the claimant) by an assignment of the insurance claim for indemnification. The court found that this arrangement satisfied the pay first provision of the policy, but added: "It must be admitted that, if there had been no payment of the judgments to the judgment creditor, but the moneys were to be held by the judgment creditor to await the result of this action, such a pretended payment would be in bad faith, and would defeat plaintiff's right of recovery." Id. at 301. In Campbell, the funds were actually transferred to the claimant as a bona fide payment of the claim and the party that had been assigned the indemnity right had actually paid the claim and sustained a monetary loss in good faith. That transaction was no doubt facilitated by the permissibility of an assignment of indemnity rights under the policy. The American Club policy prohibits such assignment.[5]
 
 
 49
 Finally, Feldman v. New York City Health & Hospitals Corp., 107 Misc.2d 145, 437 N.Y.S.2d 491, 496 (N.Y.Sup. 1981), rev'd, 84 A.D.2d 166, 445 N.Y.S.2d 555 (2d Dep't 1981), rev'd, 56 N.Y.2d 1011, 453 N.Y.S.2d 683, 439 N.E.2d 398 (1982) (adopting New York State Supreme Court opinion), a case having nothing to do with insurance, held efficacious a financial arrangement by which a tort plaintiff financed the payment by a tort defendant. The tort defendant was found 10% liable for the injury, while the third-party defendant was found 54% liable. Under the rule announced in Klinger v. Dudley, 41 N.Y.2d 362, 393 N.Y.S.2d 323, 361 N.E.2d 974 (1977), the plaintiff could not recover directly from the third-party defendant, and was in a bind because the defendant was largely insolvent and could not afford a 64% payment. The plaintiff therefore arranged for a lender to finance the defendant's payment of the 64%, and to take in return (i) an assignment of the defendant's contribution rights from the third-party defendant, (ii) a demand note from the defendant guaranteed by the plaintiff without prior recourse to the (insolvent) defendant, and (iii) 25% of any recovery from the third-party defendant as the lender's reward. Feldman, 437 N.Y.S.2d at 494. In finding that the arrangement satisfied Klinger and triggered the third-party defendant's contribution obligation, the court ruled that: (i) no disservice would be done to the limited policy behind Klinger, i.e., to avoid the defendant simply keeping the contribution funds it receives from the third-party defendant without paying the plaintiff, id. at 495; (ii) both the plaintiff and the defendant would be harmed by application of the Klinger rule in the circumstances, id. at 495-96; and (iii) the defendant's payment to the plaintiff had been financed through a bona fide loan, the proceeds of which were used to fully pay and satisfy the plaintiff's judgment, id. at 496.
 
 
 50
 As the Claimants in the present appeal point out, the Feldman court deemed the arrangements made between the plaintiff and the lender to be irrelevant to the bona fide nature of the loan between the defendant and the lender. We think Feldman is no help to Claimants here because the non-party lender in Feldman performed a real financial service for a real financial reward, whereas the recycling of funds by the Trustee here is an illusion; and the obstacle removed in Feldman was a doctrine (Klinger ) that was intended to protect plaintiffs but in the circumstances had backfired to that plaintiff's detriment, see id. at 497 ("The Court will not permit the 'shield' of Klinger to be used as a 'sword' by a culpable third party defendant who seeks to escape a judgment against it through an inflexible construction of Klinger."); see also Reich v. Manhattan Boiler & Equip. Co., 91 N.Y.2d 772, 778, 676 N.Y.S.2d 110, 698 N.E.2d 939 (1998) ("The Feldman loan agreement was sanctioned for the limited purpose of alleviating the burdens created by Klinger in the specific factual circumstances of Feldman."), whereas the obstacle faced by Claimants here is a bargained for contract clause, see Harris v. Standard Accident & Ins. Co., 297 F.2d 627, 631 (2d Cir.1961), that protects an insurer unwilling to waive it.
 
 
 51
 Claimants invoke New York's general policy of preventing an insurer from taking advantage of an insured's bankruptcy; but we cannot find that the recycling arrangement adopted by Prudential and the Claimants amounts to payment of the claims under New York law. Accordingly, we hold that the pay first provision of American Club's policy is not satisfied, and affirm the district court.
 
 
 52
 * * *
 
 
 53
 The parties' remaining disputes concern principally the number and amount of the deductibles properly payable for each claim. Claimants argue that the presence of asbestos on a particular ship is a single occurrence triggering a single deductible under each policy for all Claimants whose asbestosis injuries arose from their work on that ship. American Club argues not only that each Claimant's injury triggers payment of a separate deductible but also that each claim must be allocated between the various policies in effect during the period of a particular seamen's exposure, thus triggering multiple deductibles. For the reasons discussed infra, we find that the answer lies between these two views.
 
 II. THE DEDUCTIBLE PROVISION
 
 54
 The deductible provision in each American Club policy provides (with an inapplicable exception) that personal injury claims "are subject to a deduction" in a stated amount "with respect to each accident or occurrence." In the 1940s and 1950s, the deductibles varied from $250 to $1,000 per accident or occurrence; in the 1960s, 1970s, and 1980s, they varied from $2,500 to $50,000 (reaching $100,000 in one year). The terms "accident" and "occurrence" are not defined in the policies.
 
 
 55
 The parties dispute the proper application of the deductible provision in the circumstances of this case. The Claimants argue that the presence of asbestos on each Prudential vessel constituted a single occurrence, and that a single deductible applies to all bodily injury claims resulting from asbestos exposure aboard a particular ship within each policy year. American Club argues that each Claimant's initial exposure to asbestos within a policy year constituted a separate occurrence. Under this interpretation, each claim would be subject to a full deductible.
 
 
 56
 The bankruptcy court concluded that "the occurrence was the presence of asbestos on each [Prudential] vessel during each triggered policy period," and that "each P & I policy obligated to indemnify will be able to claim one deductible, irrespective of the number of claims filed against an individual policy." Prudential I, 148 B.R. at 747. The district court reversed and remanded, finding first that the term "occurrence" is ambiguous: "In the broadest sense of its commonly understood definition, therefore, 'occurrence' suggests the presence of the asbestos on board the ships. Under a narrower reading, 'occurrence' might mean each individual mariner's exposure to asbestos." Prudential II, 170 B.R. at 237. The district court noted that the parties had presented some extrinsic evidence of a practical construction of the deductible provision and remanded to the bankruptcy court to develop a fuller evidentiary record. Id. at 239.
 
 
 57
 The bankruptcy court conducted an evidentiary hearing on American Club's practice in interpreting the term "occurrences." The court concluded that "[t]he preponderance of the proffered evidence does demonstrate that American Club's policy for asbestosis claims resulting from exposure prior to 1989 has been to apply a deductible for each policy year in which a particular seaman worked." Prudential III, 202 B.R. at 19. However, it concluded that Prudential had not acquiesced in this policy. Id. The district court reversed, finding that the bankruptcy court's determination that Prudential had failed to acquiesce in American Club's deductible practice was clearly erroneous. Prudential IV, 209 B.R. at 623, 626.
 
 
 58
 A. Insurance Policy Interpretation Under New York Law
 
 
 59
 As noted above, although the P & I policy is essentially a maritime contract, its interpretation is governed in this case by New York law. Under New York law, an insurance policy is a contract that is construed to effectuate the intent of the parties as expressed by their words and purposes. See American Home Prods. Corp. v. Liberty Mut. Ins. Co., 565 F.Supp. 1485, 1492 (S.D.N.Y.1983), aff'd as modified, 748 F.2d 760 (2d Cir.1984). "[U]nambiguous terms are to be given their 'plain and ordinary' meaning." State of New York v. Blank, 27 F.3d 783, 792 (2d Cir.1994). "As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir.1998) (internal quotation marks and citations omitted). The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide. See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir.1998).
 
 
 60
 If the policy is ambiguous, extrinsic evidence may be introduced to support a particular interpretation. Kinek v. Paramount Communications, Inc., 22 F.3d 503, 509 (2d Cir.1994). If the extrinsic evidence presents issues of credibility or a choice among reasonable inferences, the decision on the intent of the parties is a job for the trier of fact. See Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp. 1368, 1374-75 (E.D.N.Y.1988).
 
 
 61
 Ordinarily, if an "ambiguity arises that cannot be resolved by examining the parties' intentions, ... the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract." Haber, 137 F.3d at 697. Courts in such situations often apply the contra proferentem rule and interpret a policy against the insurer. See, e.g., Westchester Resco Co. v. New England Reins. Corp., 818 F.2d 2, 3 (2d Cir.1987) (per curiam ). Here, however, Prudential was both an insured and an insurer, see Firma C-Trade S.A. v. Newcastle Protection and Indem. Ass'n, [1991] 2 App. Cas. 1 (H.L.1990) ("P & I clubs operate on a system of mutual insurance under which the successful claim of one member is paid out of the contributions of, and the calls made on, all the members including himself. Each member is accordingly both an insurer and an insured."), and the contra-insurer rule does not apply in actions by one insurer against another, see United States Fire Ins. Co. v. General Reins. Corp., 949 F.2d 569, 573-74 (2d Cir.1991) (dispute between two insurance companies); Loblaw, Inc. v. Employers' Liability Assurance Corp., 85 A.D.2d 880, 881, 446 N.Y.S.2d 743, 745 (4th Dep't 1981) (dispute between self-insured entity and excess insurer), aff'd, 57 N.Y.2d 872, 456 N.Y.S.2d 40, 442 N.E.2d 438 (1982).[6]B. The District Court's Finding of Practical Construction
 
 
 62
 After concluding that in the absence of a definition of the term "occurrence," the deductible provision was ambiguous as applied to this case, the district court based its interpretation of the deductible provision on extrinsic evidence of the parties' practical construction. Because the bankruptcy court's finding that Prudential had failed to acquiesce in American Club's practice was a finding of fact, it could be rejected only if clearly erroneous. See In re Prudential Lines, Inc., 928 F.2d 565, 569 (2d Cir.1991).
 
 
 63
 In rejecting the finding, the district court focused on two facts: (i) Prudential's failure to object to American Club's practice while Prudential was a member of American Club's board of directors; and (ii) Prudential's acceptance of the Club's reimbursement of the Graham claim, which applied multiple deductibles.[7] Prudential IV, 209 B.R. at 626.
 
 
 64
 Under New York law, "[i]f ambiguity exists, to show a practicable construction ... there must have been conduct by the one party expressly or inferentially claiming as of right under the doubtful provision, coupled with knowledge thereof and acquiescence therein, express or implied, by the other." Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 651, 593 N.Y.S.2d 966, 971, 609 N.E.2d 506 (1993) (internal quotation marks and citation omitted). Neither of the facts cited by the district court compels a finding that Prudential acquiesced in American Club's practice as a matter of law, and therefore the bankruptcy court's finding was not clear error.
 
 
 65
 As to Prudential's failure to object to the policy during American Club's board meetings, the question of the proper deductible was not discussed by the board until after Prudential left the club in 1986. Up to that time, Prudential submitted very few asbestos claims, and when it did claim indemnification for asbestos loss, it applied a single deductible for each claim, not American Club's practice of applying one deductible for each triggered policy. As Thomas McGowan, American Club's secretary, noted in a September 16, 1987 memorandum to the Board of Directors relating to the deductible practice: "Clearly the past [asbestos-related] settlements are insignificant either from the members' or the Association's point of view." Under the district court's analysis, Prudential would be considered to have acquiesced in all American Club practices, even those never discussed by the board; this is implausible. It was not clear error for the bankruptcy court as the trier of fact to infer that Prudential's silence at board meetings did not amount to acquiescence in American Club's deductible policy.
 
 
 66
 As to Prudential's failure to sue American Club over the Graham claim, the district court relied on Continental Casualty, but the case law relied on in Continental Casualty seems to suggest that finding a practical construction ordinarily requires the implementation of the supposed practice on more than one occasion. See, e.g., City of New York v. New York City Ry. Co., 193 N.Y. 543, 548, 86 N.E. 565 (1908) ("When the parties to a contract of doubtful meaning, guided by self-interest, enforce it for a long time by a consistent and uniform course of conduct, so as to give it a practical meaning, the courts will treat it as having that meaning, even if as an original proposition they might have given it a different one.") (emphasis added); see also Miller v. Clary, 147 A.D. 255, 127 N.Y.S. 897, 901-02 (N.Y.Sup.Ct 1911) (finding practical construction from practice and acquiescence over 17 years), aff'd, 147 A.D. 255, 131 N.Y.S. 1129 (4th Dep't 1911), aff'd as modified, 210 N.Y. 127, 103 N.E. 1114 (1913); Restatement (Second) of Contracts § 202(4) (1979) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.") (emphasis added); id. cmt. g. ("The rule of Subsection (4) does not apply to action on a single occasion."). It thus was not clear error for the bankruptcy court to conclude that Prudential had not acquiesced in American Club's deductible practice.
 
 C. The Intent of the Parties
 
 67
 Notwithstanding our disagreement with the district court's analysis on the factual issue of practical construction, we think that the parties to the American Club policies at issue intended to apply the interpretation advanced by American Club in this litigation, i.e., to treat each initial exposure by a Claimant to asbestos during a policy period as a separate occurrence. That conclusion is based on: (i) the wording of the policies, (ii) the contracting parties' actions prior to the commencement of litigation, and (iii) New York law on the interpretation of the word "occurrence."
 
 
 68
 First, we are not convinced that the deductible provision is ambiguous. Claimants' proposed interpretation is inconsistent with the plain and ordinary meaning of the term "occurrence." In Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127 (2d Cir.1986), we noted that "[t]he term 'occurrence' ordinarily is understood to denote 'something that takes place,' especially 'something that happens unexpectedly and without design.' " Id. at 135 (quoting Webster's Third New International Dictionary 1561 (unabridged ed.1981)). The presence of asbestos aboard a vessel cannot be said to take place, any more than in a slip and fall aboard ship the slippery deck can be said to be happening. The presence of asbestos aboard a ship is a condition that from the point of view of the ship, is in some respects a benefit. The unfortunate event causing personal injury is the exposure of people. The Claimants' construction of the term "occurrence" therefore contradicts the ordinary meaning of the word.
 
 
 69
 Second, even if we were to conclude that the deductible provision is ambiguous, we would still find that the parties to the policy intended American Club's interpretation. Although the evidence cited by the district court does not compel a finding that Prudential acquiesced in American Club's interpretation, it does show something about Prudential's reasonable expectations and intentions under the policy. "The New York courts have frequently resorted to the conduct of the parties in determining a contract's meaning, and insurance contracts are no exception to this practice." See American Home Prods. Corp., 565 F.Supp. at 1503. The district court notes with force that no party to the American Club policy (at least prior to this litigation) has ever proposed the Claimants' interpretation of the term "occurrence," i.e., a single deductible for all asbestos-related bodily injuries aboard a particular ship. The record evidence reflects that American Club has sought to apply one deductible, per claim, per policy, while Prudential and Farrell Lines, two Club members, interpreted the policies to apply a single deductible to each claim. Thus, although the Claimants attempt to introduce their interpretation as one plausible reading of the policy, this cannot be said to be the expectation or intention of the contracting parties.
 
 
 70
 In dissent, Judge Lay advances spirited arguments on the doctrinal question of the definition of "occurrence" under New York law (with which we disagree, as explained below). The short answer is that although the contract language is less than clear, it has been illumined by conduct on the part of the signatories that reflects an understanding incompatible with the position urged in this case by the Claimants, who are strangers to the contract.
 
 
 71
 Third, New York law gives some guidance for ascertaining the reasonable expectations of an insured as to number of "occurrences." In Arthur A. Johnson Corp. v. Indemnity Ins. Co., 7 N.Y.2d 222, 196 N.Y.S.2d 678, 164 N.E.2d 704 (1959), the New York Court of Appeals sought to define the term "accident" as it would be understood by "the ordinary man on the street or ordinary person when he purchases and pays for insurance." Id. at 227, 196 N.Y.S.2d at 682, 164 N.E.2d 704. The insured had constructed a temporary cinder block wall in front of each of two adjoining buildings as part of an excavation of the buildings. A rainfall of unprecedented intensity flooded the excavation beyond the capacity of the pumps, and the walls were breached within 50 minutes of each other, causing property damage within the two buildings for which the policyholder was held liable. Id. at 225-26, 196 N.Y.S.2d at 680-81, 164 N.E.2d 704.
 
 
 72
 The insurer claimed that the damage to the two buildings resulted from a single accident within the meaning of the policy, and that a single "per accident" limit of $50,000 applied. The Court of Appeals expressly considered and rejected two tests used by other jurisdictions in determining the number of "accidents," including the "negligent act or omission" test (a single occurrence for all injuries caused by the same negligent act or omission) and the "effects" test (one occurrence per each person or thing injured). Id. at 227-28, 196 N.Y.S.2d at 682-83, 164 N.E.2d 704. Instead, the court applied the "unfortunate event" test, holding that "the term [accident] is to be used in its common sense of an event of an unfortunate character that takes place without one's foresight or expectation .... an unexpected, unfortunate occurrence." Id. at 228, 196 N.Y.S.2d at 683, 164 N.E.2d 704 (internal quotation marks, citation, and emphasis omitted). The court's examples of the application of the "unfortunate event" test are indicative: a truck colliding with a freight train and damaging the road and 16 cars was a single occurrence, while an oil well fire that lasted 50 hours and hurled waste on some neighbors but not others, depending on the direction of the wind, was a series of events (important to this conclusion was the fact that the wind was a supervening force). Id. at 228-29, 196 N.Y.S.2d at 683, 164 N.E.2d 704.
 
 
 73
 In finding that the collapse of the two walls in Johnson constituted two accidents, the court stated:
 
 
 74
 [W]e need only point out that it is agreed that, during a heavy rainfall, a protecting wall collapsed under the water pressure and destruction poured into a building. Almost an hour later, another wall gave way and water flooded another building. There is no suggestion that the collapse of the first wall caused the failure of the second.... In addition, the catastrophe was not the rain--that, in itself, did no harm. It was the breach of the wall letting the rain water in. Furthermore, if the walls were located blocks away from each other on different job sites but subject to the same rainfall, no one could contest that there were two accidents.
 
 
 75
 Id. at 230, 196 N.Y.S.2d at 684, 164 N.E.2d 704.
 
 
 76
 In Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973), an insurance policy contained a per "occurrence" limit and left the word "occurrence" undefined. The Court of Appeals found no difference between the meaning of the words "accident" and "occurrence," and therefore used the "unfortunate event" test to conclude that a three-car accident amounted to a single "occurrence": "Unlike Johnson in which there was a 50-minute elapsed interval between the collapse of the first and the second cellar walls, the two collisions here occurred but an instant apart. The continuum between the two impacts was unbroken, with no intervening agent or operative factor." Id. at 174, 350 N.Y.S.2d at 899, 305 N.E.2d 907.
 
 
 77
 We have expressed the rule of these cases as follows:
 
 
 78
 In determining the number of occurrences for deductible purposes, New York inquires whether multiple claims result from "an event of an unfortunate character that takes place without one's foresight or expectation." ... [A]lthough a single "occurrence" may give rise to multiple claims, courts should look to the event for which the insured is held liable, not some point further back in the causal chain.
 
 
 79
 Stonewall Ins. Co. v. Asbestos Claims Management Corp., 73 F.3d 1178, 1213 (2d Cir.1995) (quoting Arthur A. Johnson Corp., 7 N.Y.2d at 228, 196 N.Y.S.2d at 683, 164 N.E.2d 704) (emphasis added), modified on denial of reh'g, 85 F.3d 49 (2d Cir.1996). In Stonewall, an asbestos manufacturer faced multiple asbestos-related property damage claims resulting from the installation of its asbestos product in many different buildings. The policy wording defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." Id. (internal quotation marks omitted). Drawing upon New York cases that had construed the word "occurrence" without the benefit of a policy definition, we rejected the insured's argument that all of the claims resulted from a single occurrence, i.e., the manufacturer's decision to manufacture and sell asbestos-containing products. Instead, we held that the installation of asbestos in each building was a separate occurrence because "[e]ach installation created exposure to 'a condition which resulted in property damage neither expected nor intended from the standpoint of the insured,' and for each installation, there was a new exposure and another occurrence." Id.
 
 
 80
 Stonewall distinguished Champion Int'l Corp. v. Continental Cas. Co., 546 F.2d 502 (2d Cir.1976), in which we held that claims based on the installation of defective vinyl panels in more than a thousand vehicles arose from a single occurrence, i.e., the insured's delivery of the panels to the manufacturers of the vehicles. Id. at 506. Stonewall explained that the insured in Champion was the wholesaler of the defective product rather than the manufacturer, that the wholesaler was liable upon delivery of the defective product, and therefore that the proper focus was on the sale or delivery rather than the installation of the defective product:
 
 
 81
 In Champion, the insured was exposed to liability merely because it had delivered the defective product; in this case, by contrast, [the insured's] liability, as reflected in the underlying complaints, results not from its delivery of asbestos-containing products, but rather from its manufacture of those products, resulting in the presence of [asbestos-containing materials] each time the products were installed on the property of third parties. Consequently, each location at which [the insured's] products are present, reflecting a separate installation of those products, is the site of a separate occurrence requiring imposition of another deductible.
 
 
 82
 Stonewall, 73 F.3d at 1214.
 
 
 83
 Under New York law, multiple injuries are grouped as a single "occurrence" when they arise out of the same event of unfortunate character and occur close in time with no intervening agent. Applying this test, we conclude that all asbestos-related bodily claims against Prudential resulting from exposure to asbestos on a particular ship cannot be attributed to a single occurrence. In Stonewall, we found that installation of the asbestos was the final link in the causal chain leading to a manufacturer's liability for property damage. Id. at 1213; see also Maryland Cas. Co. v. W.R. Grace and Co., 23 F.3d 617, 627 (2d Cir.1993) (holding that installation of asbestos results in immediate property damage). Claimants seek to hold Prudential liable for bodily injury and the last link in the causal chain leading to Prudential's liability for bodily injury was exposure to asbestos. Each Claimant was separately exposed to asbestos at different points in time. Therefore, the injuries arise from multiple occurrences.[8]
 
 
 84
 This conclusion is consistent with the few cases that both (i) use an approach similar to New York's in defining "occurrence" and (ii) have addressed the number of occurrences underlying multiple personal injuries from exposure to asbestos at the same location. See, e.g., Commercial Union Ins. Co. v. Porter Hayden Co., 116 Md.App. 605, 698 A.2d 1167, 1210 (Md.1997) ("There is an absolute dearth of appellate case law dealing with the meaning of 'occurrence' or 'accident' in the context of establishing policy limits in asbestos personal injury litigation."). In Commercial Union Insurance Co., the insured was an insulation contractor in the business of selling and installing insulation which until the 1970s contained asbestos and the policies at issue contained "per accident" or "per occurrence" policy limits. The court was therefore required to address
 
 
 85
 whether 1) each claimant who was injured by exposure to asbestos constituted a separate "occurrence" (or "accident"), or 2) [the plaintiff's] "decision" to install asbestos-containing insulation during a policy period was itself a single "occurrence" (or "accident"), regardless of how many persons may have been injured as a result of that single "occurrence."
 
 
 86
 Id. at 1210. The court followed the reasoning of Judge Brown in a California asbestos proceeding:
 
 
 87
 The common thread running through the California cases is that an "occurrence" or "accident" is associated with the time of injury. This leads to the conclusion that the "cause" of injury which determines the number of occurrences undoubtedly refers to the immediate rather than the remote cause of injury. As the court stated in Maples [v. Aetna Casualty and Surety Co.], supra, 83 Cal.App.3d , 647-48, 148 Cal.Rptr. 80 [ (1978) ], in reference to both California and out-of-state cases on the timing of "occurrences" or "accidents":
 
 
 88
 [T]his seemingly unbroken line of authority find[s] that the term "accident" unambiguously refers to the event causing damage, not the earlier event creating the potential for future injury....
 
 
 89
 The event causing damage in the asbestos-related bodily injury cases is exposure to asbestos fibers.... Since each individual claimant has a unique work history, each claimant's exposure must be viewed as a separate occurrence.
 
 
 90
 Id. at 1211 (quoting Asbestos Insurance Coverage Cases, Judicial Council Coordination Proceeding No. 1072, Statement of Decision Concerning Phase IV Issues, at 9-16 (Super. Ct. San Fran. Jan. 24, 1990), aff'd in part and reversed in part on other grounds sub nom. Armstrong World Indus. v. Aetna Cas. & Sur. Co., 26 Cal.Rptr.2d 35, 20 Cal.App.4th 296 (Ct.App.1993)); see also Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co., 53 F.3d 762, 767-68 (6th Cir.1995) (holding that policy defining "occurrence" as "any happening or series of happenings, arising out of ... one event" meant that each claimant's exposure to asbestos was a separate occurrence; rejecting insured's contention that decision to use asbestos in boilers was the single occurrence), cert. denied, 516 U.S. 1140, 116 S.Ct. 973, 133 L.Ed.2d 893 (1996).[9]
 
 
 91
 It might be argued that if exposure is the occurrence, each period of exposure of each Claimant (or even each breath) is a separate occurrence. American Club does not make this argument and therefore does not seek to apply multiple deductibles to each Claimant in each policy period. In any event, liability attaches following the first exposure; each Claimant's first exposure in the policy period is the final unfortunate event which causes injury, gives rise to the policyholder's potential liability, and triggers the policy; the Claimant's later exposures are a continuation of the same occurrence.[10]
 
 
 92
 We hold that each claim arose from a separate occurrence, and a single deductible is applicable to each claim.
 
 III. THE ALLOCATION ISSUE
 
 93
 Prudential claims the contract right to designate any single policy to indemnify Prudential in full for any insurance claim arising out of injury that spans two or more policy periods. American Club argues that payment of each insurance claim should be allocated in the first instance among all triggered American Club policies (as opposed to such allocation as the Club and its members may accomplish through contribution or internal accounting).[11] We conclude that the policy does not demonstrate a clear intent to allocate a policyholder's claim among policies in the first instance and that no contract or equitable consideration militates in favor of such allocation under the circumstances of this case. The chief effect of such allocation in this case would be a multiplication of the deductibles applicable to each claim. We conclude that Prudential is within its contract rights to designate one policy to pay all of any claim covered by that policy subject of course to exhaustion of the policy limits.
 
 
 94
 American Club argues that two provisions of the policy compel allocation: (i) the indemnification clause, and (ii) the other insurance clause.
 
 A. The Indemnification Clause
 
 95
 Each American Club policy covers a one-year period and provides that the Club will indemnify Prudential as
 
 
 96
 the Assured against any loss, damage or expense which the Assured shall become liable to pay and shall pay by reason of the fact that the Assured is the owner ... of the insured vessel and which shall result from the following liabilities, risks, events, occurrences and expenditures: ... Liability for ... loss of life, or personal injury to, or illness of any person....
 
 
 97
 Applying New York law, the bankruptcy court held that "injury-in-fact during the policy period triggers coverage." Prudential I, 148 B.R. at 742. Thus, each policy provides coverage for all losses or damages for which Prudential is held liable resulting from injury occurring during the policy period.
 
 
 98
 In the context of asbestos-related injuries, the bankruptcy court found that "injury-in-fact in the form of tissue damage occurs simultaneously or soon after asbestos inhalation." Id. (citing Insurance Co. of N.A. v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1222 (6th Cir.1980), clarified and aff'd. on rehearing, 657 F.2d 814 (6th Cir.1981)). The court reasoned that "[i]f a seaman were exposed to asbestos on more than one ship during any of the ships' insurance years, then more than one P & I policy would be triggered for that individual claimant." Id. at 743. The net effect of these findings--unchallenged on this appeal--is that multiple policies will likely be triggered on many of the asbestos-related claims. The question, then, is whether each policy is liable for the entirety of each claim or whether each policy is responsible for paying only the portion of the claim somehow attributable to the amount of injury during the policy period.
 
 
 99
 The answer is, it depends. When exposure, and therefore the cumulative injury, spans several policies, the harms resulting from exposure to asbestos cannot easily be assigned to a particular policy. See J.H. France Refractories Co. v. Allstate Ins. Co., 534 Pa. 29, 626 A.2d 502, 508 (Pa.1993) ("To apportion liability among the insurers on a strictly temporal basis in direct proportion to the length of time each insurer was on the risk, however, notwithstanding its surface attractiveness, assumes a linearity of disease progression which this record does not support."); Comment, Allocating Progressive Injury Liability Among Successive Insurance Policies, 64 U. Chi. L.Rev. 257, 261 (1997) (hereinafter "Allocating Liability ") ("Theoretically, damages that occur in different policy periods are divisible. In practice, however, the harms are cumulative with, and thus indivisible from, harms suffered in earlier periods.").
 
 
 100
 Some courts dealing with similar coverage language have concluded that any single policy designated by the policyholder owes full coverage. In Keene Corp. v. Insurance Co. of N. Am., 667 F.2d 1034 (D.C.Cir.1981), the court held that each triggered policy was jointly and severally liable for the insured's liability:
 
 
 101
 [E]ach policy has a built-in trigger of coverage. Once triggered, each policy covers Keene's liability. There is nothing in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period. As we interpret the policies, they cover Keene's entire liability once they are triggered.
 
 
 102
 Id. at 1048. Under this approach, (i) the insured selects a single policy from which to seek indemnification, (ii) that insurer pays the claim, and (iii) then the insurer seeks contribution from other liable insurers under the "other insurance" provisions of the policies or under the common law doctrine of contribution. Id. at 1049-50 & n. 35; see also ACandS, Inc. v. Aetna Cas. & Sur. Co., 764 F.2d 968, 974 (3d Cir.1985); J.H. France Refractories Co., 626 A.2d at 509.
 
 
 103
 This approach has its shortcomings. One commentator has noted that "[s]hoehorning all damages into one policy period is 'intuitively suspect' and inconsistent with the development of toxic tort jurisprudence. An insured purchases an insurance policy to indemnify it against injuries occurring within the policy period, not injuries occurring outside that period." Allocating Liability, supra, at 270; see Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 650 A.2d 974, 989 (N.J.1994). And adoption of the injury-in-fact trigger approach in these asbestos cases means that the cumulative injuries are attributable to multiple policies.
 
 
 104
 Some courts have adopted an approach which allocates liability among triggered policies based upon some seemingly objective factor, such as proportion of exposure occurring during the policy period, or time on the risk.[12] For example, in Owens-Illinois, after finding that the policy language was no help, the court allocated liability among policies based on "both the time on the risk and the degree of risk assumed," id. at 995, because it viewed such allocation as the most efficient and fair way to allocate losses, id. at 992-93. Further, it required the insured to bear its share of losses for periods when it was self-insured, noting: "When periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable." Id. at 995; see also Gulf Chemical & Metallurgical Corp. v. Associated Metals & Minerals Corp., 1 F.3d 365, 372 (5th Cir.1993) (apportioning defense costs among periods of insurance and self-insurance); Forty-Eight Insulations, 633 F.2d at 1224-25 (endorsing pro rata allocation of defense costs to the insured for its fair share); Uniroyal, 707 F.Supp. at 1391 (allocating loss "to each policy according to the proportion of injuries triggering that policy").[13]
 
 
 105
 Both approaches allow allocation among policies at some transactional point, i.e., either when the loss is paid, or when it becomes the subject of contribution among policies and insurers. The courts that have endorsed allocation when the loss is paid have generally been motivated by considerations of equity and policy, rather than contract wording. First, these courts have sought to ensure that a single insurer underwriting a small proportion of the risk does not get saddled with the full loss, see Uniroyal, 707 F.Supp. at 1392; Owens-Illinois, 650 A.2d at 992-93, a loss that may prove uncollectible from other companies. Second, courts enforce allocation to require the insured to absorb losses for periods when it was self-insured. As the New Jersey Supreme Court noted, "The real difference between Keene and Forty-Eight Insulations is in their treatment of periods of self-insurance." Owens-Illinois, 650 A.2d at 989. Third, these courts see allocation as the most efficient way to assign liability among policies, reasoning that any contribution proceeding will involve many of the same issues that are raised in the initial liability proceeding, and that it is more efficient to deal with these issues in a single proceeding. See Lafarge Corp. v. National Union Fire Ins. Co., 935 F.Supp. 675, 688 (D.Md.1996) ("An equitable apportionment scheme should lessen or obviate the need for subsequent rounds of litigation.... [S]econd and third rounds of litigation can be expected to result in substantial additional litigation costs for the parties.").
 
 
 106
 Fortunately, a number of factors that often complicate the inquiry are absent here. Prudential had insurance coverage in each policy period implicated by the claims, and had no periods of self-insurance. In any event, no issue has been raised that a self-insured period existed, or arose by exhaustion of limits. And for virtually the entire span of years, American Club was Prudential's only insurer. In 1971-74, Prudential was insured by another club that is not a party to this litigation, though apparently there exists an understanding among the insured shipowners and P & I insurers providing for allocation of loss among themselves.[14] American Club argues that its membership varies year by year, and that allocation among the policy years is important to determine each member's liability. However, American Club may develop (and seems already to have developed) an internal allocation mechanism for claims.
 
 
 107
 The financial significance of the allocation issue in this proceeding lies in its impact on the number of deductibles that will be applied to each claim. Under American Club's pro rata allocation approach, one deductible would apply per claim as well as per triggered policy, whereas under the Claimants' approach, all losses from any single claim would be recovered under a single policy and therefore a single deductible would apply to each claim. Given: (i) the policy's broad language covering "any loss [or] damage" which Prudential becomes liable to pay resulting--presumably even in part--from injuries occurring during the policy period; (ii) the absence of a contractual intent to require allocation of liability among policies in the first instance; and (iii) the lack of any compelling policy or equitable considerations favoring allocation, we decline to read the policies in a way that would have the (probably unintended) effect of multiplying the deductibles applicable to each claim.
 
 
 108
 We hold that, in the circumstances presented, Prudential has the right to demand that a policy pay full coverage for each insurance claim in which the underlying Claimant suffered asbestos exposure and therefore asbestos injury during the policy period.
 
 B. The Other Insurance Clause
 
 109
 The other insurance clause does not compel allocation of liability among triggered American Club policies in the first instance: "The Association shall not be liable for any loss, damage or expense against which, but for the insurance herein provided, the Assured is or would be insured under existing insurance."
 
 
 110
 In construing this clause, we must determine the intent of the parties as expressed by the policy's words and purposes. See American Home Prods. Corp. v. Liberty Mut. Ins. Co., 565 F.Supp. 1485, 1492 (S.D.N.Y.1983), aff'd as modified, 748 F.2d 760 (2d Cir.1984). The wording says that the Association, i.e., American Club, will not be liable if there is other existing insurance that would cover the particular loss. The evident intent of this clause is to reduce American Club's liability when insurers other than American Club also insure against the same risk. This clause does not reduce liability or compel allocation in the first instance when more than one of American Club's own policies is triggered. Moreover, we will not infer from this clause an intent to allocate liability among American Club's own policies when the only consequence of such allocation would be to multiply the deductibles applicable to each claim.
 
 
 111
 Whether the other insurance clause reduces Prudential's liability for claims which are covered by Prudential's 1971-74 coverage is a different question. But it is inappropriate to resolve that issue at this stage because we do not know whether such claims exist and do not have before us the other club's policy. Moreover, cases following the approach which we adopt here have employed other insurance clauses to distribute liability in the contribution phase, not in the liability phase. See, e.g., Keene Corp., 667 F.2d at 1050; Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co., 45 Cal.App.4th 1, 52 Cal.Rptr.2d 690, 707-08 (Cal.App.1996); J.H. France Refractories Co. v. Allstate Ins. Co., 534 Pa. 29, 626 A.2d 502, 509 (1993). It may be that such an arrangement would be appropriate in this case as well.
 
 
 112
 Accordingly, we hold that the other insurance clause does not mandate allocation of liability among triggered American Club policies in the first instance. That is, Prudential may seek recovery under a single triggered policy of its choosing, and American Club presumably will allocate liability among the triggered policies as an internal accounting matter, or through claims for contribution, or not at all, as its board and internal governance provide or allow. See, e.g., Keene Corp., 667 F.2d at 1049-50.
 
 CONCLUSION
 
 113
 To summarize: (i) the recycling arrangement created by the Stipulation and Settlement Agreement does not satisfy the pay first provision of American Club's policy; (ii) each Claimant's asbestos-related injuries arose from a separate occurrence and therefore a single deductible will be applied to each claim; and (iii) liability will not be allocated in the first instance among triggered American Club policies.
 
 
 114
 The judgment of the district court is affirmed.
 
 LAY, Circuit Judge, dissenting:
 I.
 
 115
 The majority holds that "each claim arose from a separate occurrence, and a single deductible is applicable to each claim." I must respectfully disagree. Such a construction is not supported by the law of New York. The consequence of the majority's conclusion, based upon the idea that the exposure of the claimants is an "occurrence," is that each subsequent exposure would also count as a separate occurrence. The majority recognizes this possible consequence of its logic, but avoids it by simply stating that American Steamship Owners Mutual Protection and Indemnity Association ("American Club") does not make such an argument. The majority opinion stops short of this unavoidable and unreasonable conclusion and instead concludes that the intent of the parties was that "each claimant's first exposure in the policy period is the final unfortunate event which causes injury. ..."[1] In all due respect, such a construction depends solely on a fictional hypothesis.
 
 
 116
 The majority acknowledges that in Arthur A. Johnson Corp. v. Indemnity Ins. Co., 7 N.Y.2d 222, 228, 164 N.E.2d 704, 707, 196 N.Y.S.2d 678, 683 (1959), the term "accident" was defined by the "unfortunate event" test. In Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 173, 305 N.E.2d 907, 910, 350 N.Y.S.2d 895, 899 (1973), the court of appeals used the unfortunate event test to define the term "occurrence." In these two cases, however, it was not necessary to determine whether occurrence and accident were intended to have different meanings.
 
 
 117
 In Uniroyal, Judge Weinstein observed that the policy at issue in the Agent Orange case read that occurrence was not identical to accident, but includes accident as well as "event," "happening," and "continuous or repeated exposure to conditions." Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp. 1368 (E.D.N.Y.1988). Judge Weinstein then observed: "The insurance industry developed this newer 'occurrence' definition in order to provide clearly for coverage of gradual, continuous, and prolonged events that might have been excluded by the instantaneous connotation of 'accident.' " Id. The cases which he thereafter cites state that "occurrence provides broader coverage than 'accident.' " Id. (citing Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135-36 (2d Cir.1986)).
 
 
 118
 The policy language of the American Club provides coverage for "accident or occurrence." Although the policy language in the instant case is not identical to that construed by Judge Weinstein in Uniroyal, it is similarly fundamental that the two terms in the policy at issue were not intended to mean the same thing because they are set forth in the disjunctive. In any event, relying on the definition in Webster's Third New Int'l Dictionary 1561 (unabridged ed.1981), the majority adheres to New York law and applies the "unfortunate event" test to define an occurrence. The majority opinion, however, thereafter equates both the event and injury as the definition of occurrence. It is at this juncture I must respectfully part company.
 
 As Judge Weinstein observed:
 
 119
 Neither the Johnson nor the Wesolowski court provided any guidance, apart from the "average man" aphorism, on how to identify the "unfortunate event" or on how to distinguish among several plausible such events. All that can surely be drawn from those two cases is that the "unfortunate event" is not the "negligent act or omission" and it is not the injury to each victim. The "unfortunate event" is evidently one of the several happenings, with the exception of the negligent act or omission, which precedes and contributes to the resulting injury.
 
 
 120
 Uniroyal, 707 F.Supp. at 1382. Judge Weinstein identified "interrelated casually contributing events" in the Agent Orange case and then goes on to say: "In this sense, the terms of the definition of 'occurrence' are partly ambiguous: they identify a set of possible occurrences, but give little assistance in selecting the proper item from that set." Id.
 
 
 121
 In the present case, the majority summarily dismisses the Uniroyal analysis on the ground that the policy in Uniroyal specifically provided that the occurrence was defined not to be the injury; that the injury was stated to be the result of the occurrence.[2] It is true that the American Club policy does not contain the same language as the Uniroyal policy. However, this is not fatal to the analysis. More critical to the point is the fact that the policy does not contain a definition that occurrence means both "the event and the injury resulting therefrom." The policy is ambiguous.
 
 
 122
 Under these circumstances one could urge that the most favorable construction of the ambiguity should be resolved in favor of the insured, Prudential Lines, Inc. ("PLI").[3] However, more importantly, because the term is not defined, a common understanding dictates that an "unfortunate event" (an occurrence) is what causes an injury and unless defined to the contrary, common principles of cause and effect should govern a basic understanding. The court in Uniroyal quotes from the Sixth Circuit case of Michigan Chem. Corp. v. American Home Assurance Co., 728 F.2d 374 (6th Cir.1984), to illustrate this view:
 
 
 123
 The vast majority of courts ... have concluded that although injury must be suffered before an insured can be held liable, the number of occurrences for purposes of applying coverage limitations is determined by reference to the cause or causes of the damage and not to the number of injuries or claims. The number and timing of injuries is relevant in addressing the distinct question of the policy period to which each injury will be assigned.
 
 
 124
 The definitions of "occurrence" in the present insurance policies reflect this approach.... The language makes the [event] constituting the occurrence logically distinct from the injuries which later take place.... We hold that ... the policy terms admit of only one reasonable interpretation.
 
 Michigan Chemical, 728 F.2d at 379.[4]
 
 125
 Under the majority's approach, the policy is triggered at the time of the injury (the exposure of a claimant) which is likewise construed to mean the occurrence. In common parlance, however, it is only logical that an event is separate from the damage it causes. The policy language in Uniroyal is nothing more than a re-statement of the common understanding of the relationship between "occurrence" and "injury." If one slips and falls on a slippery floor, injury may or may not happen. A person may fall and not discover until months later that a herniated disc was caused by the fall. The occurrence was not the injury but the fall. Similarly, one can be exposed to asbestos and not be harmed. Twenty years ago the federal government ordered that all asbestos insulation be removed from all federal buildings. The repeated exposure of government workers from the time of installation to the time of removal did not result in reported injuries. To urge that the unfortunate event is the initial exposure (injury) of the claimant to the asbestos adopts nothing more than a fictional analysis which will deprive, at least in the present case, thousands of injured claimants of their lawful damages under the policy.
 
 
 126
 The occurrence and the injury it produces need not have any relationship to each other in time or place. The time of the occurrence producing the ultimate injury is irrelevant to triggering the policy. The majority's argument that it is the immediate event (the exposure) rather than the remote cause of injury (the presence) merely states a principal of causation (proximate cause) which is intended to avoid but-for reasoning. But the immediate event created by PLI in this case is not a multiple accident but a continuous condition which ultimately could and did result in bodily injury to over 8,000 seamen. The individual exposures were not caused by the steamship line. They occurred through the acts of the seamen. The installation and presence of the asbestos on the ships, as the place of employment, was the last immediate and unfortunate event brought about by the PLI. The present case begs for the adoption of Judge Weinstein's reasoning in Uniroyal. Where there is an ongoing exposure by several claimants to a hazardous condition, some event other than the exposure should be the occurrence in order to avoid the injustice where a single condition causes hundreds of thousands of injuries constituting hundreds of thousands of occurrences.
 
 
 127
 In the present case, just as in Uniroyal, there are multiple events to choose from to define the occurrence. It could be the purchase of the asbestos by PLI, the overall presence of the asbestos on each ship, the overall presence of the asbestos on all ships, the initial exposure by each claimant, or the overall multiple exposure by each claimant. The latter two events equate the injury with the occurrence and should be rejected. Because the allocation of each policy per policy year requires a new deductible, it is only logical that the overall installation and presence on all ships should constitute a single occurrence.
 
 
 128
 In Uniroyal, Judge Weinstein recognized that finding a single continuous occurrence is especially appropriate in cases involving mass deliveries of hazardous products that impose damage on large numbers of people. Uniroyal, 707 F.Supp. at 1384. Similarly, in Champion Int'l Corp. v. Continental Cas. Co., 546 F.2d 502 (2d Cir.1976), the Second Circuit found that 1,400 installations of defective paneling constituted only one continuous and repeated occurrence. Although the Stonewall decision cited by the majority distinguishes Champion 's single occurrence choice, Stonewall did hold that the installation of asbestos was the proper occurrence because it caused the asbestos exposure. Stonewall Ins. Co. v. Asbestos Claims Management Corp., 73 F.3d 1178, 1212-1213 (2d Cir.1995), modified on denial of reh'g, 85 F.3d 49 (2d Cir.1996). The Second Circuit in Stonewall and the majority reject Champion 's analysis because Champion was the distributor of the defective product, whereas, Stonewall was the manufacturer and installer of the asbestos. Here, however, PLI was simply the provider of a place of employment where the asbestos was installed. PLI was not the manufacturer or the installer. In addition, Stonewall related to damage to property; property damage lies in a totally different context from bodily injury incurred by the individual claimants.
 
 
 129
 In this case, however, applying the doctrine of most favorable construction for the insured makes the overall installation and presence the likely choice in the face of ambiguous policy language. Beyond this, it would seem that the common understanding, in the terms of the "average business man," supports this rule. Furthermore, this approach is more equitable and manageable. There is nothing in the policy or the law which contradicts it.
 
 
 130
 Such a result would certainly fall within the reasonable expectations of both the insured and insurer. Furthermore, this analysis does not depend on fictional hypothesis but rather on the actual experience involved here. The occurrence in this case was the continuing presence of the asbestos and is clearly separate from the injury encountered by the claimants' exposure. In sum, common understanding of the term "occurrence" points to the underlying event rather than to the initial exposure (injury) by the worker.
 
 II.
 
 131
 Plaintiffs' utilization of the $300,000 reserve fund to recycle all payments (set up and approved by the bankruptcy judge as a part of the reorganization plan) provided only a momentary loss, but it was a loss. In 1969, Judge Mansfield observed:
 
 
 132
 [T]he courts of New York have repeatedly held that an insured fulfills his obligations under an indemnity policy and is entitled to reimbursement when a judgment against him has been satisfied, and the insurer may not escape its obligation to indemnify by showing that the payment made by the assured was advanced to it by a third party or financed in some other fashion.
 
 
 133
 Liman v. American S.S. Owners Mut. Protection & Indem. Ass'n, 299 F.Supp. 106, 109 (S.D.N.Y.1969), aff'd, 417 F.2d 627 (2d Cir.1969).[5]
 
 
 134
 The majority rejects plaintiffs' plan of recycling payments to the claimants on the ground that plaintiffs' arrangement was to finance "the whole of the claims, not the deductible alone." The majority then reasons that "indemnity is sought for a loss that the policy holder has not incurred." (emphasis added). Thus, the majority finds that plaintiffs' non-recourse notes to the claimants is not a loss.
 
 
 135
 In all due respect, I fail to understand the proffered distinction. The payment of $300,000, the satisfaction of judgments, along with the proffer of the non-recourse notes to each claimant constitutes a loss to the estate. It has created a new obligation to pay from existing estate funds certain sums of money. For example in Liman, the estate was able to pay all but $1,000 to each claimant. If it had been required to pay all 147 deductibles, it would not have had sufficient funds to pay any claims. Thus, the promissory notes in Liman were directly related to the estate's ability to pay the various claimants. In addition in Liman, if all deductibles had been paid, the United States government would not have sufficient funds to protect its priority claims.
 
 
 136
 The majority reasons that "the insured's lack of assets to satisfy claims against the bankrupt estate typically leaves the insured unable to sustain the loss and pay the claim." The result of the majority's decision is wholly inequitable; it allows a windfall to the insurer and denies any hope of payment to the injured worker. The financial plan created by Liman followed by the bankrupt estate mitigates this inequity and provides some partial relief.
 
 
 137
 By reducing each claim to a money judgment, the estate must obtain satisfaction of the judgment by proffering up to $300,000 to each claimant. When it has done that, the fact that the judgment creditor loans the monies back to the estate in exchange for a non-recourse note is not a sham. True, it is a contrived plan, but it was contrived in good faith with approval of the court.[6] Prudential received no benefit from the plan. The note, albeit a non-recourse note, is a loss to the estate and can be filed in the estate as a claim against the estate, and depending upon the monies available, it will diminish the estate.[7]
 
 
 138
 Under this plan, each claimant (note holder) as a general creditor will still not be paid in full--but in this case, partial payment is better than nothing. Furthermore, what happens to the monies Prudential paid out should be of little concern to the indemnitor. There is no case that holds the plan is wrong;[8] equally, there is no case that holds on all fours that it is right. But the proposed plan is within the spirit of the law (finding a remedy for the right) and does not result in total forfeiture and a windfall to the American Club.
 
 
 
 *
 Honorable Donald P. Lay, of the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 The wording of the Stipulation is as follows:
 
 
 [11]
 Pursuant to the Plan and solely from the Liman Funds, ... the Trust shall pay (the "Claim Payment") each Allowed Claim.... The Claim Payment shall be made to Claimants' Counsel and shall at all times be held by Claimants' Counsel in its trust or escrow account.... Immediately upon clearing the account where deposited, the claims from each Claim Payment shall be used by each Asbestosis Claimant to or on behalf of whom a Claim Payment was made, and by Claimants' Counsel to make the Claimant Loan described in paragraph 12 hereof
 
 
 [12]
 In order to facilitate the implementation of the Plan, and further to assist the Asbestosis Claimants in the realization of the proceeds of the Coverage under which the Debtor may have been insured with respect to an Asbestosis Claimant's Insured Claim, each Asbestosis Claimant, through Claimants' Counsel, shall loan (the "Claimant Loan") to the Trust, a sum up to and including the amount of the Claim Payment.... The Claimant Loan shall be made in cash or certified or wired funds immediately upon receipt of the Claim Payment by Claimants' Counsel.... The Claimant Loan shall be "non-recourse" to the Liman Funds, the Trust, the Debtor and the Trustee, and ... neither the Debtor, or the Trust shall have any obligation to repay the Claimant Loan
 
 
 [2]
 In July 1994, the district court held that the recycling arrangement did not satisfy the pay first clause of American Club's policy. Prudential II, 170 B.R. at 242. In addition, the district court vacated the bankruptcy court's August 4, 1993 and September 21, 1993 orders requiring American Club to reimburse Prudential for claims paid under the Stipulation and Settlement Agreement, holding that: (i) the bankruptcy court failed to afford American Club discovery on the reasonableness of the Stipulation and Settlement Agreement, and to permit American Club to challenge that Agreement as unreasonable; and (ii) the bankruptcy court failed to determine the reasonableness of the Stipulation and Settlement Agreement "in accordance with the standards outlined by the Supreme Court and the Second Circuit" for the settlements of claims against a bankrupt estate. Id. at 247
 Then, on December 6, 1994, while the motion for interlocutory appeal was pending, the bankruptcy court vacated the Stipulation and Settlement Agreement as unfair because the district court's ruling (that the loan arrangement did not satisfy the pay first provision) prevented the funding of the settlement. See In re Prudential Lines, Inc., 59 F.3d at 330 ("The bankruptcy court concluded that, in light of the district court's rejection of the Liman recycling scheme incorporated therein, the Claimants could not be paid and the settlement therefore was not in their best interests."). The court said at a November 24, 1994 hearing:
 Judge Haight directed that I determine whether the original stipulation was fair.
 Based upon the facts which have been presented in reference to the funding of the plan, the funding of the settlement, it is clear that [the] settlement cannot meet a fairness determination nor can it meet a settlement of a claim or a case because there is really not a clear ability to fund that settlement without the cooperation of the clubs ....
 However, it is clear that [there is] an inability to fund it and there has been no evidence to the contrary.
 I know [Claimants' attorney] has alluded he can get the money, but the only thing that talks in bankruptcy is money, it appears to me that settlement cannot be implemented. So, therefore, I do not find that it is fair, nor do I find that it is an appropriate settlement under the [TMT Trailer ] case because it just is not appropriate under these circumstances.
 (emphasis added). The bankruptcy court's citation was to Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), which provides the general test for the fairness of settlements entered as part of a reorganization, see id. at 424-25, 88 S.Ct. at 1163 ("[T]he judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."); citation to that case did not introduce a different reason for the vacatur.
 
 
 [3]
 As the bankruptcy court noted, New York has the most significant connections to the policies: American Club drafted and issued its policies in New York, and the parties negotiated coverage here as well
 
 
 [4]
 The dissent inadequately characterizes Liman. Without support, the dissent recites that "in Liman, the estate was able to pay all but $1,000 to each claimant.... [T]he promissory notes in Liman were directly related to the estate's ability to pay the various claimants." Dissent at [page 90]. In fact, the Government objected to the payment of the debtor's claims in Liman because the payment of the deductible would have amounted to a preference, and unlike the rest of the claim, the deductible portion of the payment would not have been reimbursed. In any event, as noted infra, we see Liman as turning on the limited extent of the recycling arrangement
 
 
 [5]
 In Employers' Liability Assurance Corp. v. International Milk Products Co., 192 A.D. 88, 182 N.Y.S. 337 (1st Dep't 1920), the question was whether the insurer could invoke the policy subrogation clause to recover against third parties liable to the insured when the insurer paid the claimant directly before any payment was made by the insured. The court's holding, that direct payment by the insurer of the claim on behalf of the insured triggered the subrogation provision, id. at 92, 182 N.Y.S. at 339-40, has no obvious bearing on the present appeal
 
 
 [6]
 The unifying principle employed in the dissent as to both the deductible and pay first issues is that the P & I contract issued by American Club must be construed to maximize the rights of Prudential as the policyholder. First, that principle (whatever its effect might otherwise arguably be) is not implicated here, because (among other reasons) Prudential (i) is one of a handful of American Club's membership companies, (ii) holds an appreciable interest in it, (iii) is represented on its board of directors, and (iv) has actively guided many of its fortunes and policies. Second, the contra proferentem principle, which by nature is applicable as a last resort, does not come into play in this case because the conduct of the parties, and other interpretive guides, allow us to ascertain the parties' intended meaning of the contract
 
 
 [7]
 The district court described the Graham claim as follows:
 On the Graham claim, [Prudential] paid out $50,000 and, in late 1983 and early 1984, presented a claim for reimbursement to American Club. This time, more than one policy year was involved; there were twelve (12) (1952-1963). The Club applied a deductible for each policy year. The deductibles totalled $49,000. Accordingly, the Club paid [Prudential] $1,000 plus legal expenses of $2,463.65. So far as American Club's records reveal, [Prudential] accepted that payment without protest.
 Prudential IV, 209 B.R. at 625.
 
 
 [8]
 The bankruptcy court rejected this conclusion because it determined that bodily injury occurs immediately or soon after exposure to asbestos, and prior cases had found that the term "occurrence" should be construed to mean something different than "injury." For this proposition the bankruptcy court relied heavily on Uniroyal, Inc., in which the policy explicitly distinguished between occurrence and injury. See Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp. 1368, 1380 (E.D.N.Y.1988) ("The policy Home sold to Uniroyal makes clear the distinction between the 'occurrence' and the 'injury.' "). American Club's policy does not make the same distinction. In addition, the proximity in time between the occurrence and the injury presented no problem in Stonewall, in which we found that each installation constituted an occurrence even though the injury--property damage--also occurred immediately upon installation. See also Maryland Cas. Co., 23 F.3d at 627. Notwithstanding the important conceptual distinction between injury and occurrence, the two often occur actually or virtually together
 
 
 [9]
 A decision to the contrary is Owens-Illinois, Inc. v. Aetna Cas. & Sur. Co., 597 F.Supp. 1515 (D.D.C.1984), in which the court found that personal injury claims against the manufacturer of an asbestos-containing product arose from a single occurrence, i.e., the decision to manufacture and sell the product. Id. at 1525-27. That case is inapposite because its analysis differs from New York's "unfortunate event" test (i.e., Owens-Illinois, relying on policy language, looked for a unifying event in the causal chain) and because American Club's policy does not contain the arguably unifying language that appears in the Owens-Illinois policy. See also Stonewall, 73 F.3d at 1213 (characterizing Owens-Illinois as an attempt to "maximize[ ] coverage")
 It is worth noting that most Comprehensive General Liability ("CGL") policies contain the same clause as in Owens-Illinois, under which "all personal injury ... arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." Our reading of the American Club policies (which contain no such clause) may have limited application to asbestos personal injury cases involving CGL policies.
 
 
 [10]
 The dissent would construe the contract to maximize coverage on the theory that in cases involving "ongoing exposure by several claimants to a hazardous condition, some event other than the exposure should be the occurrence in order to avoid the injustice where a single condition causes hundreds of thousands of injuries constituting hundreds of thousands of occurrences." Dissent at [page 89]. Earlier, the dissent warns that, if Prudential owes 5,000 deductibles, one for each Claimant, "[t]he practical result is that American Club will owe little or no coverage." Dissent at [page 87 n. 1]. Elsewhere, the dissent predicts a "total forfeiture and a windfall to the American Club." Dissent at [page 91]
 With all respect, this is grossly overdrawn. And while the dissent's interpretation would increase the insurance yield under the particular policies at issue here, the insurance yield would decrease under that interpretation when claims arising out of a single continuous occurrence are presented under policies with low per occurrence limits but high (or no) aggregate limits. In any event, the dissent's analysis amounts to reasoning from result.
 
 
 [11]
 American Club asserts that the district court misunderstood it to argue that the losses should be allocated among all policies covering ships on which a Claimant was exposed to asbestos (even ships owned by other shipping lines), rather than only triggered policies covering Prudential ships. Whether or not such a misunderstanding occurred below, on appeal American Club only seeks to allocate liability among triggered policies covering Prudential ships
 
 
 [12]
 We have never addressed the allocation issue directly. In Stonewall Insurance Co., the district court ruled that "each triggered policy was responsible for only a pro rata share of [the manufacturer's] liability as to a particular claimant," and this ruling was not challenged on appeal. Stonewall Ins. Co. v. Asbestos Claims Management Corp., 73 F.3d 1178, 1202 (2d Cir.1995), modified on denial of reh'g, 85 F.3d 49 (2d Cir.1996). We therefore had no occasion to pass on the general issue of whether allocation among multiple triggered policies is required or permitted. However, the insured in Stonewall did challenge the allocation of liability to itself during years when it was uninsured--what has been labelled "proration-to-the-insured." We held that the district court did not err in allocating liability to the insured under this allocation formula for periods in which the insured lacked coverage (at least during the period when coverage for asbestos risk was available), noting that " 'proration-to-the-insured' is a sensible way to adjust the competing contentions of the parties in the context of continuous triggering of multiple policies over an extended span of years." Id. at 1203
 
 
 [13]
 American Club argues that allocation of loss among policies is a corollary of the injury-in-fact trigger. We are unconvinced. Courts that employ an exposure trigger (which works much like injury-in-fact in this case) may also allocate among policies as a reasonable and fair approach, but they do not treat allocation as a corollary of the exposure trigger, mandated by the same medical or scientific assumptions. See, e.g., Clemtex, Inc. v. Southeastern Fidelity Ins. Co., 807 F.2d 1271, 1276 (5th Cir.1987) ("The Forty-Eight court's analysis, it seems safe to say, equates the full course of a victim's exposure (and virtually simultaneous tissue damage) with continuous bodily injury."); Commercial Union Ins. Co. v. Sepco Corp., 765 F.2d 1543, 1546 (11th Cir.1985) ("We believe that the exposure theory is more accurately analyzed as positing not that each inhalation of asbestos fiber results in bodily injury, but rather that every asbestos-related injury results from inhalation of asbestos fibers.")
 
 
 [14]
 American Club asserts that the loss should be allocated in part to the unidentified, non-party club that insured Prudential in policy years 1971-74. But Prudential's rights (if any) vis-a-vis that non-party are not before us, and the record reflects that the various clubs and their members have reached an understanding for the allocation of loss on seamen's asbestos claims:
 [T]here is already in place among shipowners and their P & I underwriters a practice to allocate liability for asbestos claims among shipowners pro rata according to sea service days of the seaman's employment by each owner; if an owner had more than one underwriter for implicated policy years, a further allocation is made among underwriters, and the Club applies one deductible for each implicated policy year.
 American Club's Reply Brief at 15-16 n. 3. We have no reason to believe that American Club and the club which insured Prudential from 1971 to 1974 have not reached a similar agreement, thus rendering inapplicable the policy considerations favoring allocation discussed above.
 
 
 [1]
 Under such reasoning, as in the Agent Orange cases, there exists in the present case more than 5,000 occurrences and the result will be that there exists 5,000 deductibles. The practical result is that American Club will owe little or no coverage
 
 
 [2]
 Judge Weinstein stated "[i]f the policy had defined the occurrence to be both the 'event and the injury resulting therefrom,' " the result might have been different. Id. at 1380
 
 
 [3]
 In regard to the question of applying contra proferentum in the context of this case, I fail to see that PLI is not the insured in its relationship to the American Club simply because it also shares in a system of mutual insurance. PLI is not an insurance company and it does not act as a self-insurer as the insured did in Loblaw, Inc. v. Employers' Liab. Assurance Corp., 85 A.D.2d 880, 446 N.Y.S.2d 743 (N.Y.App.Div.1981), aff'd, 57 N.Y.2d 872, 442 N.E.2d 438, 456 N.Y.S.2d 40 (1982), the case cited by the majority. In its relationship with American Club its status is not "more akin to that of an insurance company than to that of an individual who is inexperienced in matters of insurance coverage for whose benefit the rule was promulgated." Id. at 881, 446 N.Y.S.2d at 745. Furthermore, PLI's mutual association with other steamship lines is irrelevant to the relationship of American who has insured PLI
 
 
 [4]
 I fully recognize American Home can be distinguished on the basis that its policy terms state that the occurrence is distinct from the injury. However, once again the American Club policy does not contradict these terms or expressly provide to the contrary. Because of such ambiguity, at the very least, the doctrine of reasonable expectation of the insured should apply
 
 
 [5]
 Judicial approval of the use of a promissory note as a means of payment to satisfy the "pay first" requirement of an indemnity policy can be found in early decisions throughout the country. For example, in Riner v. Southwestern Sur. Ins. Co., 85 Or. 293, 165 P. 684 (1917), the court stated that "[n]ot only the weight of precedent, but also the weight of reason, gives support to the doctrine that the making and delivery of a note may be a loss actually sustained." Id. at 687 (listing cases which hold that the giving of a promissory note is a loss within the meaning of an indemnity policy)
 
 
 [6]
 Cf. Taxicab Motor Co. v. Pacific Coast Cas. Co. of San Francisco, 73 Wash. 631, 132 P. 393 (1913), in which the insured under an indemnity policy satisfied a judgment against it through the use of a promissory note. The court observed:
 [I]t will be remembered that the terms of the proposed payment and satisfaction were made known by the administratrix to the judge sitting in probate and received his sanction and approval before the settlement was made. It seems to us that this latter fact is alone sufficient to dispel any idea of bad faith that might arise from the transaction itself, and sufficient to require some direct and cogent proof of bad faith before it can be held that the transaction is not what it purports to be.
 Id. at 395 (emphasis added).
 
 
 [7]
 A note "has been held in numerous cases sufficient to constitute loss or damage under an indemnity against loss if that note is accepted as payment and in satisfaction of the judgment against the obligee." Walker Mfg. Co. v. Dickerson, Inc., 510 F.Supp. 329, 332 (W.D.N.C.1980) (citing Seattle & S.F. Ry. & Navigation Co. v. Maryland Cas. Co., 50 Wash. 44, 96 P. 509 (1908); Kennedy v. Fidelity & Cas. Co. of New York, 100 Minn. 1, 110 N.W. 97 (1907)). As the Walker case observed these early state court decisions held that "execution of a note accepted as satisfaction for a judgment against the maker was a 'loss' sufficient to support recovery under an indemnity against loss, notwithstanding the possibility of the maker's insolvency." Walker, 510 F.Supp. at 332
 
 
 [8]
 The majority cites two cases in support of its attempt to distinguish Liman from the present case: Ahmed v. American S.S. Owners Mut. Protection & Indem. Ass'n, Inc., 444 F.Supp. 569 (N.D.Cal.1978), aff'd in part, remanded in part, 640 F.2d 993 (9th Cir.1981); and Conoco, Inc. v. Republic Ins. Co., 819 F.2d 120 (5th Cir.1987). However, these cases are substantially different from the case before this court
 The majority cites Ahmed for the proposition that it distinguishes Liman because the insured in Ahmed "never paid any of the claims against it or arranged to finance such payments." Ahmed, 444 F.Supp. at 572. Ahmed involved an attempt by an injured third party to maintain a direct action against a marine indemnity insurer after the insured shipping company became insolvent. The court held that New York law does not allow for such direct actions in the marine indemnity context. Ahmed, 444 F.Supp. at 572. It is obvious that when an injured third party attempts to directly sue the indemnity insurer that the insured will not have "paid any of the claims against it or arranged to finance such payments." See id. However, in the present case, the insured did "arrange to finance such payments" through the recycling agreement and did in fact "pay the claims against it." Therefore, the facts of the present case are not so easily distinguished from Liman as they are in the Ahmed decision.
 The majority also cites Conoco in support of its proposition that the present case and Liman are distinguishable. In Conoco, an insolvent insured executed a demand promissory note, two years after its insolvency, in favor of the injured party claiming that the note was payment under the marine indemnity policy. Conoco, 819 F.2d at 121. The court held that the execution of the promissory note by the insured was not an actual expense and did not trigger the indemnity policy. Id. at 122-23. The facts of Conoco, however, are significantly different from the facts of the present case. *91_
 First, in Conoco, the injured party informed the insured that it would not attempt to collect on the promissory note. Id. at 121. There was no such assurance made by the claimants in this case. Second, the Conoco decision was supported by and decided under Texas law, not New York law. Id. at 123. Third, in Conoco, the insured was "completely bereft of assets" and "literally incapable of sustaining a loss." Id. at 122. The insured corporation was also dissolved. This is not true here. In addition, the insured in Conoco "offered no hope of eventually providing any value at all in exchange for the note." Id. at 123 (emphasis added). While Prudential may not have the assets to completely pay the full amount of claimants' judgments, Prudential does have some assets (as evidenced by the $300,000 used in the recycling agreement) and is capable of sustaining a loss. Prudential does offer hope of providing some value for the non-recourse notes.