RELIANCE INSURANCE COMPANY, Continental Insurance Company, Royal Insurance Company, and New York Marine General Insurance Company, Plaintiffs,

v.

KEYSTONE SHIPPING COMPANY and, Intercoastal Bulk Carriers, Defendants.

Reliance Insurance Company, Continental Insurance Company, Royal Insurance Company, and New York Marine General Insurance Company, Third Party–Plaintiffs,

v.

Sedgwick James of Pennsylvania Third Party–Defendants.

No. 96 CIV. 5948(RLC).

United States District Court, S.D. New York.

June 21, 2000.

pany, ("Continental"), and Royal Insurance Company, ("Royal"), (collectively "plaintiffs" or "insurers"), seek a judgment declaring that they are not required under the provisions of a marine multi-liability excess insurance policy ("bumbershoot policy") to indemnify the defendants: Keystone Shipping Company, ("Keystone"), and Intercoastal Bulk Carriers, ("IBC"), (collectively "defendants" or "assureds"), for costs defendants incurred during the arbitration and settlement of a claim brought by New England Power Company ("NEP") seeking costs for a damaged ship defendants sold to NEP under a charter agreement. Alternatively, plaintiffs argue that if defendants' claim is covered under the bumbershoot policy, third party defendant, James Sedgwick of Pennsylvania, Inc., ("Sedgwick"), is required to indemnify them for any costs paid to the defendants.

## I. FACTS

### A. The Charter Agreement Dispute

In 1980, defendants formed an agreement with NEP to build the "Energy Independence," a self-unloading coal transport vessel ("the vessel"), that would be used for transporting NEP coal supplies. (Jt. Or. at 52, ¶ 13).[1] The Energy Independence is a "bulk carrier": it spans the length of two football fields, is approximately six stories high, and has five cargo holds composed of bare uncoated, unlined and unpainted steel. (*Id.* at 53, ¶ 14). The vessel was completed and launched in 1983. (*Id.* at 52, ¶ 13). From that time forward, it was exclusively engaged in transporting coal from various United States's ports to NEP's New England coal burning plants. (Tr. at 476).

Brown Gavalas & Fromm, L.L.P., New York City, David Fromm, Harry A. Gavalas, Timothy G. Hourican, Of Counsel, for Plaintiffs.

Proskauer Rose Goetz & Mendelsohn, L.L.P., New York City, John H. Gross, Amy Sandgrung, Seth Schafler, Of Counsel, for Defendants.

Wilson, Elser, Moskowitz, Edelmen & Dicker, New York City, Philip J. Walsh, Of Counsel, for Third Party Defendants.

### OPINION

ROBERT L. CARTER, District Judge.

Plaintiffs Reliance Insurance Company, ("Reliance"), Continental Insurance Com-

1. "Jt. Or." refers to the undisputed facts set out in the Joint Pre–Trial Order filed June 15, 1999. "Def. Mem." refers to *Defendants' Post Trial Reply Brief*, filed March 9, 2000. "Pl. Mem." refers to *Plaintiffs' Post Trial Reply Brief*, filed March 9, 2000. "Tr." refers to the trial transcript from the six day bench trial held before this court, commencing on December 14, 1999. "Pl. Ex." refers to plaintiffs' exhibits, "Def. Ex." refers to defendants' exhibits, and "Jt. Ex." refers to the Joint Trial Exhibits as described in the Trial Exhibits list, filed June 18, 1999, and used in the December 14, 1999 trial.

In 1989, Keystone and NEP entered a new agreement controlling the use and disposal of the vessel ("charter agreement"). The charter agreement outlined the terms of NEP's continuing charter of the vessel ("charter provisions"); it also granted NEP the right to purchase the vessel during the charter term ("buy-out provisions"). Specifically, the charter provisions designated IBC, an affiliate of Keystone, as the vessel's "owner"; designated NEP as the vessel's "charterer"; and named Keystone as the vessel's "operator". (Jt. Ex. 115). The charter provisions also required IBC, as "Owner [of the vessel, to] . . . maintain the vessel in class throughout the period of the Charter," and to "exercise due diligence . . . to make the Vessel tight, staunch, strong, seaworthy and in good order and condition." (Jt. Ex. 115) (Charter Agreement, clauses 3 & 6).

The buy-out provisions in the charter agreement set the purchase price for the vessel at an amount sufficient to pay off the vessel's remaining financing costs, and to provide defendants with approximately 5 to 10 million dollars in profit. (Tr. at 429–31). The precise purchase amount for the vessel was computed under calculations in "appendix five" of the charter agreement. (Jt. Ex. 115). During the negotiations of the buy-out provisions, Philip Fisher, the Chief Financial Officer and Vice President of Keystone and the President of IBC, asked Keystone's insurance broker and in-house risk manager, Sedgwick, whether the charter agreement's buy-out provisions could be insured. (Tr. at 348). Charles Achuff, Sedgwick's Vice President, advised Fisher that the buy-out provisions could not be insured under any type of insurance policy. (Id.). The buy-out provisions were then drafted to provide that the vessel was to be sold "as is where is." (Tr. at 338).

In November, 1994, NEP exercised its buy-out option, and defendants opposed the purchase of the vessel. (Jt. Or. at 53, ¶ 20; Tr. at 446–47). The parties submitted their dispute for arbitration, and the arbitration panel ultimately held that NEP had properly exercised its buy-out rights and could terminate the charter and buy the vessel. (Jt. Ex. 116 at 2). The parties then entered a settlement, dated September 10, 1995, which provided that the vessel would be sold to NEP for the purchase price set by appendix five of the charter agreement. (Tr. at 447; Jt. Ex. 166). On September, 28, 1995, defendants delivered the vessel to NEP. (Tr. at 447).

In October, 1995, NEP put the vessel in drydock at Bethlehem Steel in Sparrows Point, Maryland, and conducted surveys to assess the vessel's condition. (Pl. Ex. 11 at 2). The surveys revealed that the vessel's holds were severely wasted, in addition to needing numerous other repairs. (Id.). NEP arranged to have the vessel repaired and, in a letter dated April 22, 1996, informed defendants that the vessel was damaged and that NEP would file a claim against them for $11,173,732.00 in damages. (Pl.Ex. 21). Only part of NEP's damage claim was directly attributable to the cost of repairing the vessel. For example, only approximately 8. million dollars of NEP's damage claim was for the costs NEP incurred in arranging for steel renewals to the vessel.[2] (Id.).

NEP brought its damage claims before the same arbitration panel that had handled the parties' prior dispute. At this hearing, NEP argued that defendants had breached clauses 3 and 6 of the charter agreement, requiring defendants to perform diligent maintenance on the vessel, and to keep the vessel "in class" and "in good repair" during the period of the charter. (Jt. Or. at 54; Jt. Ex. 232). The arbitration hearing was held over twenty-six days, and the panel ultimately decided that defendants could be held liable for the damage to the vessel under clauses 3 and 6

---

**2.** Aside from costs stemming from the steel renewals, plaintiffs also requested damages for $1,480,279.00 for other vessel repairs, and $1,605,000.00 in consequential damages for the loss of use of the vessel during the repair period.

of the charter agreement.[3] (Jt. Or. at 54, ¶¶ 21–24). Defendants and NEP then entered a settlement agreement, dated August 29, 1997, in which defendants agreed to settle all of NEP's remaining damage claims for $3,250,000.00 (Jt. Ex. 248).

Sedgwick subsequently notified plaintiffs that defendants intended to file a claim to cover the costs of its settlement with NEP for the vessel's damages under a bumbershoot policy plaintiffs had issued to defendants for the period May 11, 1995, to May 1, 1996. Specifically, defendants requested indemnification for: $3,250,000.00 in damages and $2,000,000.00 in punitive damages paid to NEP in the settlement; $350,120.00 NEP collected as interest on the settlement; $1,891,800.92 in lawyers' fees incurred while opposing NEP's claims; $479,174.64 in costs and expenses incurred in the arbitration; and interest at prime rate plus 3% on the claim settled with NEP as of the date the settlement was made.

### B. The Policy

The bumbershoot policy at issue is a standard marine umbrella insurance policy; it provides both excess insurance coverage and "drop down" coverage.[4] (Tr. at 18, 27). The excess insurance provisions provide insurance coverage over and above the limits of the assureds' enumerated primary insurance policies, and only respond when the limits of the primary policies have been exhausted. *See* Raymond P.

Hayden & Sanford E. Balick, *Marine Insurance: Varieties, Combinations and Coverages*, 66 Tul. L. Rev. 311, 353 (1991) ("Marine Insurance"). The "drop down" provisions of the policy fill in gaps in coverage left by the primary insurances. *See id.* at 361; (Tr. at 27). The dispute in this case concerns the scope of the bumbershoot policy's drop down provisions.

Defendants purchased their bumbershoot policy through Sedgwick. Negotiations on the policy began when Joseph Morency, the Assistant Vice President and Marine Underwriters Liability Manager for Reliance, advised Sedgwick Assistant Vice President Elizabeth Gallagher, that defendants' current bumbershoot policy was about to expire. Morency indicated that Reliance was interested in participating in a joint subscription with other insurers for defendants' bumbershoot coverage for the year 1995–1996, contingent upon its approval of defendants' insurance renewal application ("application") (Tr. at 52–53).

Gallagher prepared the application, which required detailed information regarding defendants' potential liabilities, and their primary insurance coverage for the 1995–1996 calendar year. On page 00006 of the application, in response to the question "Describe contractual coverage in primary policy[s]," Gallagher indicated:

"Lease agreements covered by primary

---

**3.** Although the buy-out provision in the charter agreement indicated that the ship was to be sold "as is where is," the arbitration panel concluded that the maintenance clauses of the charter agreement survived the sale of the vessel, and that, if the issues concerning the vessel's damage were fully litigated, defendants could be held liable to NEP for the repairs to the vessel under these provisions. This determination did not resolve whether defendants were in fact liable for negligent maintenance, and therefore the arbitration decision does not bar this court from determining the causes of the vessel's damage. *Cf. USX Corp. v. Adriatic Ins. Co.*, 2000 WL 636912 at *13 (W.D. Pa. Mar.22, 2000) (explaining that only an issue of liability which has been fully and fairly litigated in an arbi-

tration hearing cannot be challenged in subsequent proceedings by a party) (discussing Pennsylvania law); *Khandhar v. Elfenbein, M.D.*, 943 F.2d 244, 247 (2d Cir.1991) (same)(discussing New York law).

**4.** The parties agree that the terms of this policy provide drop down coverage. The issues in this case are therefore distinguishable from those involving policies in which the rules of contract construction lead the court to construe ambiguous contract terms to provide drop down coverage. *See* Raymond P. Hayden & Sanford E. Balick, *Marine Insurance: Varieties, Combinations and Coverages*, 66 Tul. L. Rev. 311, 361 (1991).

CGL.[5] *Charter Parties/Labor Agreements/Operating Agreements covered by P & I policy.* Storage/Transfer Agreements covered by Terminal Operators Liability Policy." (Jt. Ex. 223 emphasis added).

The P & I policy Gallagher referred to in the application was a protection and indemnity ("P & I") policy that another insurer, American Club, had issued to Keystone. Gallagher also indicated in the application that the American Club P & I policy offered defendants unlimited P & I coverage, except for a $500,000,000 pollution limitation. (*Id.*; Tr. at 55). Gallagher testified that she was at Keystone's offices when she prepared the application and could have examined the American Club P & I policy and the charter agreement, but she failed to do so. (Tr. at 484–85). Gallagher further testified that her statement in the application, that defendants' charter agreement liability was covered under the American Club P & I policy, was only intended to indicate that this insurance would cover some charter agreement liabilities. (Tr. at 483).

Morency testified at trial that he reviewed the application and, based on Gallagher's responses, agreed that Reliance would issue defendants bumbershoot coverage from May 11, 1995, to May 1, 1996. (Tr. at 55–56). Morency also testified that, since he assumed that defendants had unlimited P & I coverage for the charter agreement, he calculated their premium for the bumbershoot policy using a percentage of the standard premiums for Terminal Operators, Contingent Marine Liability, Comprehensive General Liability and Automobile policies. (*Id.* at 57–58).

Sedgwick was responsible for preparing the final policy, which was a series of boilerplate excess multi-liability insurance forms with standard bumbershoot clauses. (Tr. at 20–21). The parties had no further communication about the bumbershoot policy's scope until April 1996, when plaintiffs received a letter from Sedgwick indicating that defendants would seek indemnification under the bumbershoot policy for the costs of repairing the vessel's damage and other costs from the settlement with NEP. (Pl. Ex. 20).

## C. Claims Process Facts

At the start of the dispute with NEP about the vessel's damage, defendants assigned Achuff to investigate which of their insurance policies would indemnify them for the potential liability arising from this matter. Achuff had Sedgwick employees send letters to several of defendants' insurers which summarized NEP's allegations that defendants' deficient maintenance had severely damaged the vessel during the charter term. (*See, e.g.,* Pl.Ex. 21) ("Sedgwick claim letters"). Before sending out the claim letters, Achuff discussed NEP's allegations with Ralph Hill, Keystone's general counsel, and other Keystone officials. Although the parties considered several causes for the vessel's wastage, no one indicated, as later alleged, that microbes had damaged the ship.

In response to a Sedgwick claim letter, American Club sent Sedgwick a letter, dated May 30, 1996, denying defendants coverage under defendants' primary P & I policy. (Jt. Ex. 243). American Club indicated that the dispute about the vessel's damage concerned wear and tear damage to the assureds' own property, and therefore was not covered under the terms of their P & I policy. (*Id.*).

American Hull Insurance Syndicate ("AHIS"), the underwriter of defendants' primary hull policy, also responded to the Sedgwick claim letter by denying defendants coverage. AHIS explained that the costs from the dispute about the vessel's damage "did not arise from losses sustained as the owner of the vessel, but rather [were being made] on the basis of [defendants'] contractual indemnity to NEP[ ]," and therefore defendants should

5.  CGL refers to comprehensive general liability coverage.

look to their third party liability policies to cover these losses. (Jt. Ex. 246).

Plaintiffs also responded to the Sedgwick claim letter by denying defendants coverage. In a letter, dated July 23, 1996, plaintiffs indicated that the dispute about the vessel's damage was not covered under the bumbershoot policy because: (1) the damage to the vessel was a result of ordinary wear and tear, and therefore was not an "occurrence" covered by P & I insurance, and (2) the damage to the vessel occurred while defendants still owned the vessel, and therefore did not constitute third party liability. (Jt. Ex. 240). Achuff discussed with Keystone officials the various letters from defendants' insurers denying defendants coverage. Although Keystone officials mentioned several possible causes for the vessel's damage, again, no one suggested that microbes had caused the damage. (Tr. at 354).

On August 12, 1996, Sedgwick and Reliance representatives convened to discuss whether Reliance, as lead underwriter, would extend coverage under the bumbershoot policy for the dispute about the vessel's damage. During the meeting, Reliance and Sedgwick representatives discussed the damage to the vessel as though it had resulted from ordinary wear and tear; no mention was made of damage-causing microbes. (Tr. at 114–16, 367–69).

After the meeting Sedgwick crafted a response to Reliance's denial of defendants' claim. In a letter, dated August 13, 1996, Sedgwick explained that the vessel's damage was caused by repeated exposure to environmental conditions which triggered oxidation and corrosion of the vessel's steel holds. (Pl.Ex. 39). Achuff reviewed this letter with Keystone's general counsel and other Keystone and IBC officers, and the letter was approved. (Tr. at 365–66). None of these officers indicated at this time that the vessel's damage was caused by microbes.

Reliance again indicated to defendants that it did not believe that the bumber-shoot policy offered coverage for the vessel's damage or the NEP settlement; defendants continued to assert that the policy did cover these costs. Reliance ultimately convened with the other underwriters who had subscribed to the bumbershoot policy and with counsel, and as a group denied defendants coverage under the policy. (Tr. at 31–32). Additionally, the underwriters brought the instant claim under 28 U.S.C. § 1333 and § 2201 for a declaratory judgment establishing that the bumbershoot policy does not provide coverage for the vessel's damage costs and the other costs from the NEP settlement.

## II. ANALYSIS

### A. Preliminary Matters

#### 1. Choice of Law Stipulation

Prior to trial the parties stipulated that either New York or Pennsylvania law applies to the instant dispute, and that in a case of conflict between the laws of these two states Pennsylvania law should be applied. (Jt. Or. at 56, ¶ 2). As demonstrated below, since the stipulation merely provides for the same result produced under a choice of law analysis, the stipulation will be enforced.

[1–3] Maritime cases have their own federal common law choice of law rules. *See State Trading Corp. of India v. Assuranceforeningen Skuld,* 921 F.2d 409, 413, 416–417 (2d Cir.1990). Specifically, conflict of laws questions are decided in maritime cases "by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 1988 WL 75262 at *2 (S.D.N.Y. July 13, 1988) (Carter, J.) (citing *Lauritzen v. Larsen,* 345 U.S. 571, 582, 73 S.Ct. 921, 97 L.Ed. 1254 (1953)). Some courts have developed specific conflict of laws analyses for maritime contract cases and, although the Second Circuit has not yet developed

its own analysis, it has used the framework in the Restatement (Second) of Conflict of Laws for resolving these questions. *See State Trading Corp.*, 921 F.2d at 416–417 (citing Restatement (Second) of Conflict of Laws § 188(2) (1971)). The Restatement indicates that a conflict of laws question should be resolved in a maritime contract case by considering: 1) the place of the parties' contracting; 2) the place of negotiation of the contract; 3) the place of performance; 4) the location of the subject matter of the contract; and 5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.*

The insurance policy in this case was formed as a result of a series of communications between Sedgwick's Pennsylvania office and Reliance's New York office. (Jt. Ex. 222). The place of performance was Pennsylvania, as the underwriters delivered the signed policy to Sedgwick's Pennsylvania office, and demanded their premium. (Jt. Ex. 224). The subject matter of the contract, the vessel, was docked at a variety of New England ports throughout the insurance policy period. (Tr. at 476). Last, although their sites of incorporation are diverse, the plaintiff insurers all do business through New York underwriters. (Walsh Aff. Ex. 1 at 2). The defendants, although incorporated in Delaware, do business in Pennsylvania, and the third party defendant, Sedgwick also does business in Pennsylvania. (Jt. Or. at 51).

The conflict of laws analysis indicates that New York and Pennsylvania are the jurisdictions with the strongest interest in this case. The remaining question is whether the two states' substantive rules of law conflict and, if so, which state's rules should be applied. This marine insurance contract will be interpreted under state canons of contract construction, *see Navigators Ins. Co. v. Am. Home Assurance Co.*, 1999 WL 681161 at *6 (S.D.N.Y. Sept. 1, 1999) (Chin, J.), and since the contract principles involved in this case are the same in both states, there is no further need for a conflicts analysis. *See Lucker Manuf. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir.1994). Furthermore, since there is no conflict between the jurisdictions, the court will refer to both Pennsylvania and New York law in the course of its discussion. *See id.*

## 2. Evidentiary Burdens

■ As in all insurance cases, the assured bears the initial burden to make a prima facie case establishing that the loss he suffered is covered under the policy's terms. *See Pacific Resources Inc. v. Oswego Shipping Corp.*, 1984 WL 928, at *2 (S.D.N.Y. Sept.26, 1984) (Sofaer, J.). Therefore, in this case, defendants must make the first offer of proof. To establish their prima facie case, defendants must prove, by a preponderance of the evidence: 1) that a policy was issued; 2) that they suffered a loss; and 3) that the loss was an event within the terms of the policy. *Id.*

Plaintiffs acknowledge that the defendants have successfully established the first two elements of a prima facie case: they were issued the bumbershoot policy and the vessel's damage was a loss. The sole dispute is whether defendants suffered a loss covered under the policy terms. To demonstrate that they suffered a loss under the policy, defendants first presented proof that the vessel's damage was caused by an abnormal corrosive force. Defendants next presented arguments that this damage was covered under the policy terms.

## B. The Cause of the Vessel's Damage

■ Defendants contend that a corrosive force inflicted catastrophic damage on the vessel sometime after April, 1995—the start of the bumbershoot policy term. To support their claim, defendants offered expert testimony from marine engineer Alan Nierenberg, chemist Dr. Brenda Little, and American Bureau of Shipping [ABS] surveyor Irving Owen. Plaintiffs offered expert testimony from marine engineer James Dolan and microbiologist Dr. Marc

Mittleman, as well as documentary evidence, to establish that the vessel's damage was normal wear and tear.

### 1. Expert Witnesses

Defendants' first expert witness was Irving Owen, a senior surveyor who has been employed at ABS for more than thirty years. (Tr. at 127). Owen's testimony was offered to show that the ABS surveys conducted on the ship indicated that the vessel was undamaged and seaworthy in April, 1995 and that some corrosive force destroyed the vessel after the April, 1995 survey.

Owen testified that ABS certified inspectors conduct tests on vessels like the Energy Independence during annual, intermediate (every 2.5 years) and special surveys (every 5 years), each with respectively increasing levels of scrutiny, in order to determine the amount of steel that has been corroded away from a ship's holds. (Tr. at 128). The thickness of the ship's holds is measured through a method called gauging, in which ultrasonic equipment is used to take measurements off the hull walls. These measurements are then compared to the thickness of the hull walls as of the date the ship was built. Owen is not certified to take gaugings; however, he participates in ship surveys by calibrating the gauging machines, selecting hull measurement sites and reviewing the gauging data. Also, Owen makes the ultimate determination as to whether the vessel is seaworthy.

Owen reported on three ABS surveys conducted on the vessel. The first survey he discussed was conducted in September, 1994; he and ABS certified gauging surveyors descended in a crane bucket inside the vessel's holds and did a visual inspection of the interior walls. (Tr. at 133). In his September, 1994 survey report he indicated that there was no significant wastage in the vessel. (Tr. at 135–36). Owen participated in another survey of the vessel in April, 1995; on this occasion, he and the ABS certified surveyors descended into the vessel holds and took gauging readings while standing inside the holds on piles of coal. (Tr. at 144–159). The coal was loaded at two different heights to allow the surveyors to measure for wastage at two levels within the holds of the vessel. Owen testified that he saw no serious hull corrosion in April, 1995. (Id. at 144–159). Owen also participated in the October, 1995 ABS survey of the vessel at the Bethlehem Sparrows Shipyard. 13,000 gauging readings were taken at this survey, and the surveyors discovered that the ship had suffered heavy wastage. (Tr. at 159). In light of the extensive damage, Owen declared the vessel unseaworthy.

■ The court assesses the reliability of a proffered expert's testimony under the yardsticks the Supreme Court established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Company v. Carmichael*, 526 U.S. 137, 151–52, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *Daubert* provides that when expert witness testimony is offered the court must insure that it is both relevant to the instant dispute and based on credible scientific methodologies. *See Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. *Kumho Tire* indicates that the same standard applies when the court reviews technical expert testimony. *See Kumho Tire*, 526 U.S. at 151–52, 119 S.Ct. 1167. Therefore, in considering whether to accept both the scientific and technical expert witnesses' testimony in this case, the court will consider whether: (1) the theory or technique used by the expert has been tested; (2) subject to peer review and publication; (3) has a known or potential margin of error; and/or (4) whether the technique or method enjoys general acceptance within a relevant community. *See Daubert*, 509 U.S. at 592–94, 113 S.Ct. 2786. The aforementioned factors are not a definitive checklist for ascertaining the testimony's reliability; but, rather, help structure the Rule 702, F.R.E., inquiry. *See id.*

The court will rely on Owen's testimony. First and foremost, it is relevant to the instant dispute, as it explains how marine vessels are inspected, and how surveyors identify serious damage in a vessel. Additionally, Owen's testimony meets the *Daubert* yardsticks. The gauging surveys he participated in were conducted according to industry standard ABS protocols: all the measurements used in his reports compared the vessel holds' walls' thickness on a given date with the thickness of the wall at the time the vessel was built. This standard is accepted by the shipbuilding and repair community, and its accuracy and reliability stood unquestioned throughout the trial.

On the whole, however, Owen's testimony did not assist defendants in demonstrating that a rapid corrosive force took hold in the vessel. On cross examination he indicated that he did not conduct the ABS surveys with much vigor. He was assigned to perform an "intermediate survey" of the vessel in 1994, but merely conducted a visual review of the vessel. (Tr. at 167). Additionally, he only visually examined one vessel hold in 1995, making it an open question whether the corrosion in other parts of the vessel was more intense than in the section he analyzed. Also there was significant doubt about whether an inspection conducted while standing on piles of coal could have generated accurate findings, as the holds were coated with coal dust and a black oil residue which complicated visual inspections, and could have interfered with gauging measurements. (Tr. at 169). Last, and most important, on cross examination Owen retracted his statement that no wastage had occurred in the ship prior to October 1995. He testified that in his report on the April, 1995 survey he noted that there were several areas of serious wastage in the ship, and he highlighted several "suspect" areas in the vessel in need of further analysis. (Tr. at 177–78).

Defendants' next expert witness was Alan Nierenberg, a marine engineer who works as a consultant in the shipbuilding industry. (Tr. at 182–83). Nierenberg was offered as an expert in "shipbuilding, conversion, [and] repair [of] commercial, offshore and government vessels," and because of his familiarity with gauging measurements. (*Id.* at 184–85). Nierenberg holds a bachelor's degree in marine engineering, and a masters degree in mechanical engineering. (*Id.*) He has worked at various shipyards in his more than twenty-year career, and was president of Avondale Industries, the fourth largest shipyard in the country. (*Id.* at 184). Nierenberg examined gauging readings from the vessel while working on a damage assessment for the NEP arbitration hearings, and conducted an additional analysis of the data in preparation for this trial. (Tr. at 194; Def. Ex. U).

Nierenberg testified that his analysis showed "the corrosion rates that occurred at different points in the ship's life." (Tr. at 194). He used "mathematical and engineering" calculations to "analy[ze]... the differences [in the steel to] determin[e] the actual loss of steel, [and] where the wastage was ... and what the rate of loss of steel was on an annual basis." (Tr. at 198–99). Nierenberg conducted three analyses on the gauging data. First he compared gaugings taken from the vessel in 1992, April 1995, and October 1995, compared these gaugings to the original thickness of the hull walls, and then determined the relative rates of hull corrosion across these three dates. (Tr. at 193–195). Nierenberg also did a structural study of the vessel's "hold one" comparing gauging data taken from the hold in April 1995, with data from the October, 1995 survey. (Tr. at 199). Last Nierenberg analyzed 13,000 gaugings taken in the October 1995, survey to determine if there was a consistent rate of corrosion across the vessel's five cargo holds. (Tr. at 199).

In summary, Nierenberg determined that between April and October, 1995, the rate of wastage in the Vessel was sixty five times the rate that it had been for the

prior eleven and a half years. (Tr. at 210–211). He also found that the rate of corrosion in hold one was twenty-eight times what it had been in the past eleven years. (Tr. at 221).

The court concludes that Nierenberg's study is based on an unorthodox and unproven method for analyzing gauging measurements. ABS, the group that certifies surveyors to take gauging readings, uses gauging data for a limited purpose: it compares gauging measurements taken on a given date with the original "as built" thickness of the vessel's hull walls. (Tr. at 170–72). Nierenberg, in contrast, compared gauging data between the various holds, and compared gauging data taken from three post-construction dates in the vessel's life to determine if the rate of corrosion had increased between these dates. Nierenberg indicated that he knew of no study or surveying company that used gauging data in this way; he also indicated that ABS has not sanctioned any of his analytic methods. (Tr. at 190–192). The evidence before the court indicates that Nierenberg's methods are not accepted by the maritime community, and there is no evidence that his methods would yield reliable or probative findings; as such, the court will not rely on his report and testimony in reaching its conclusions. See Mancuso v. Consolidated Edison Co. of New York, Inc., 56 F.Supp.2d 391, 398–407 (S.D.N.Y.1999) (Conner, J.)(excluding expert witness's testimony because of her failure to follow standard methodology for her field).

Defendants' last expert witness was Brenda Little, Ph.D., a chemist and senior scientist at naval research laboratory Stenice Space Station. Little was offered as an expert in microbially-influenced corrosion or "MIC;" a process in which microbes take root in the walls of a vehicle and trigger intense acid based corrosion. (Tr. at 505–07). Little testified that she is a private consultant and Navy advisor, and is required in the course of her work to offer advice on MIC. (Tr. at 499). She noted that there are sixty published peer reviewed studies on MIC, and she authored thirty-nine of these studies. Little also has written a book and sixty symposium papers on MIC. (Tr. at 500). Little conducted her study on the vessel in September, 1997; she reviewed a Seaworthy Systems report analyzing the ABS gauging data, examined Nierenberg's report, and conducted a series of experiments on the two coal samples collected from the vessel in 1995, and two vessel hold wall samples collected in 1995. (Tr. at 505, 517–18) (Def. Ex. "CC").

Little concluded that the ship suffered abnormally high rates of corrosion damage after April, 1995, and that this damage was caused by MIC. (Tr. at 524). She acknowledged that normally coal transport vessels experience some degree of hull corrosion because of the interaction of the coal and the vessel's holds. However she testified that, in her view, the rate of corrosion in the vessel far exceeded the expected rate of coal-influenced corrosion one would expect in a ship of the vessel's age. (Tr. at 513–524). MIC was the likely culprit for the damage, she explained, because the vessel's holds were made of uncoated and unlined steel, and microbes living in coal will take root in these surfaces and trigger accelerated acid corrosion. (Tr. at 505–07).

Little explicitly acknowledged that her claims about MIC in marine transport vessels were part of "a relatively new field." (Tr. at 499). The sixty peer reviewed studies she cited in support of her opinion all concerned MIC in the coal mining industry. (Tr. at 501). Only one of the studies seemed relevant to the analysis Little submitted at trial, as it concerned railroad transport cars; however, since it is clear that marine transport and ground transport vehicles face different environmental conditions that would affect their relative rates of corrosion, this study did not demonstrate to the court that Little's theories about marine vessel MIC are a

natural outgrowth of the established scientific theories about this phenomenon. (*Id.*)

Plaintiffs responded to Little's MIC analysis by offering rebuttal expert witness testimony from Dr. Marc Mittleman. Mittleman's testimony was offered to show that there were serious methodological flaws in Little's study. Mittleman has a bachelors degree in microbiology, a masters degree in marine and microbiology, and a Ph.D. and postdoctoral experience in "biofouling in marine environments." As a forensic analyst, he consults with various private companies, NASA, and other government agencies. Mittleman indicated that he had extensive experience with MIC, and defendants stipulated as to his status as an expert.

Mittleman testified that Little's study was deficient because the group of coal and hull samples she examined was too small to generate consistent and reliable findings. He also noted that she failed to conduct laboratory tests with control group samples to confirm that the type of damage she discovered actually could occur. (Tr. at 569–70). Mittleman also noted that the standard procedure for reviewing MIC samples is to take the samples from the field site and rapidly transport them to a laboratory, in order to avoid contamination. (Tr. at 570–71). In contrast, the samples Little used in her analysis were stored for two years in non-antiseptic sites that exposed them to airborne dust, soil and other materials, all of which could have infected the samples with microbes after their removal from the vessel. (Tr. at 569).

The court has already concluded that Little's study was based on dubious scientific ground, and Mittleman's testimony provides further basis to question the integrity of Little's findings. Based on these conclusions, the court concludes that Little's analysis does not measure up to the *Daubert* yardsticks and is too unreliable to be used to determine the cause of the vessel's damage.

The final expert that testified about the cause of the vessel's damage was plaintiffs' expert James Dolan. Dolan offered expert testimony about the normal rates of corrosion in marine vessels, as shown by gauging measurements. Currently a managing partner and marine consultant at the firm of Martin, Ottoway, Van Hemmen & Dolan, he was previously employed at ABS for twenty-six years. During this period he gained extensive experience in taking gauging measurements and supervising gauging surveys. (Tr. at 255). Dolan examined the data from various ABS surveys of the vessel, including the 1994 and 1995 gauging surveys, and concluded that the vessel showed the normal amount of wear and tear that an eleven year old marine coal transport vehicle would show, particularly if it had not been regularly cleaned. (Tr. at 258–68). Dolan explained that coal transport ships with uncoated holds typically experience high rates of hold corrosion. (Tr. at 258). No evidence was presented challenging the propriety of Dolan's analysis, and the court recognizes that his conclusions were based on standard applications of ABS gauging data and fell within his area of expertise. Given these findings, the court relies on his testimony in reaching its conclusions about the cause of the vessel's damage.

### 2. Documentary Evidence

Last, plaintiffs offered a series of letters generated during the insurance claim process which indicated that defendants had, prior to trial, consistently represented that the vessel's damage had resulted from ordinary wear and tear, and that the damage was caused by defendants' minimal maintenance of the vessel. (Tr. at 114–116, 367–69). Additionally, they showed that defendants only had the vessel holds cleaned once, in 1992, (Tr. at 481), and this failure to clean the vessel could have caused significant vessel corrosion.

When the evidence is reviewed as a whole, the bulk of the admitted facts indicate that the damage to the vessel's holds

resulted from normal wear and tear. Dolan's testimony, which was based on standard ABS gauging analysis, indicates that the level of wastage in the vessel is the typical level present in coal transport vessels in service for more than a decade that have received minimal cleaning. Plaintiffs also showed that the vessel had only been cleaned once in its more than eleven years of service, bolstering the conclusion that the vessel's damage resulted from coal-based corrosion and improper maintenance. Last, Owen's testimony indicated that the 1994 and April 1995 gauging surveys were not conducted in a vigorous or detailed manner, thus making it likely that some of the wastage that was occurring in the vessel prior to October, 1995, slipped by unreported. Based on this evidence, the court concludes that no abnormal corrosive force took root in the vessel after April, 1995; rather, the vessel was slowly damaged by the corrosion typically associated with coal transport vessels.

Defendants attempted to show that an abnormal corrosive force destroyed the vessel to demonstrate that they suffered a sudden, catastrophic loss during the policy period. (Def. Mem. at 12). The court's conclusion that the vessel's damage was caused by normal wear and tear, demonstrates that the loss was not sudden and weakens defendants' claim. However, since plaintiffs conceded at trial that the assureds were not required to show that they suffered a sudden loss in order to merit coverage under the policy, (Tr. at 411), the court proceeds to defendants' legal arguments as to why the vessel's wear and tear damage should be construed as falling within the policy terms.[6]

### C. Policy Interpretation

■ Defendants first argue that the wear and tear damage to the vessel is covered under clauses 1(c)(ii) and 2(b) of the policy, the provisions providing drop down coverage for "Property Damage" "occurrences" not covered by underlying insurances. (Def. Mem. at 7–9).

In considering defendants' arguments the court will read the insurance policy as a whole and construe it according to its plain meaning." *See USX Corp. v. Adriatic Ins. Co.,* 2000 WL 636912 at *10 (W.D.Pa. Mar.22, 2000); *Prudential Lines Inc. v. Am. Steamship Owners Mutual Protection and Indemnity Assoc., Inc.,* 158 F.3d 65, 77 (2d Cir. 1998) (discussing New York law). If the policy is unambiguous it will be interpreted solely by reference to the policy terms. *See USX Corp.,* 2000 WL 636912 at *9; *Prudential Lines,* 158 F.3d at 77. If the policy contains ambiguous clauses, extrinsic evidence of the parties' intent may be admitted to clarify these provisions. *See Prudential Lines,* 158 F.3d at 77. A provision is ambiguous if it is susceptible to two reasonable interpretations. *See USX Corp.,* 2000 WL 636912 at *9; *Prudential Lines,* 158 F.3d at 77.

Clause (1)(c)(ii) provides, that the assured has coverage for:

(1)(c) All other sums which the Assured shall become legally liable to pay or by contract or agreement become liable to pay in respect of claims made against the Assured for damages of whatsoever nature, on account of:

(ii) Property Damage

caused by or arising out of each occurrence happening in the world. (Jt. Ex. 225).

Clause 2(b) indicates that the assured is covered for:

"$[80 Million] Ultimate Net Loss in respect of each occurrence *not covered by said underlying insurances.*" (Jt. Ex. 225) (emphasis added).[7]

---

6. Indeed, it appears that defendants' claim is that the failure to clean the vessel led to unexpected and catastrophic results. *See Continental Grain Company v. Fireman's Fund Ins. Co.,* 1997 WL 86392 at *2 (S.D.N.Y.

Feb.27, 1997) (Duffy, J.) (explaining that an assureds' actions based on calculated risks may give rise to a covered "accident").

7. The parties have stipulated that the drop down provision provides for $80 million dol-

Defendants' claim for coverage is as follows: (1) the hull wastage is property damage; (2) the wastage was an unforseen circumstance, and therefore constitutes an "occurrence" (3) the settlement agreement defendants entered with NEP made defendants "liable under contract" to pay for the vessel's wastage, and (4) since the wastage is not covered by underlying insurance, it is eligible for drop down coverage. Additionally, defendants note that the policy offers indemnity for "Ultimate Net Loss" and, under the policy terms, this means that the costs they incurred in the arbitration of the vessel damage settlement are covered as well.

Plaintiffs argue that defendants' claim is untenable as clauses 1(c)(ii) and 2(b) must be read in conjunction with clause IV(2), which defines "Property Damage." *See Harbor Ins. Co. v. Lewis*, 562 F.Supp. 800, 805 (E.D.Pa. 1983) ("a party cannot lift one clause out of an insurance contract and attach a meaning to it considered in isolation.").

Clause IV(2) provides that:

> "[t]he term Property Damage wherever used herein shall mean loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured.)"

Plaintiffs argue that this provision amounts to an "owned property exclusion," and establishes that an assured cannot make a claim under the policy for damage to his own property. Additionally, they note that defendants have stipulated that they owned the vessel when the damage to the vessel occurred and, therefore, the above definition of property damage bars defendants from making a claim for coverage under clause 1(c)(ii).

Defendants, however, have identified another group of clauses in the policy that could be interpreted to supercede the "Property Damage" definition in clause IV(2): the "Bumbershoot Supplemental Clauses." Specifically, they argue that Bumbershoot Supplement provision I, entitled "Conditional Exclusions" creates an exception allowing the assured to make a claim for property damage to his own property when the damage results from a charter dispute. (Def. Mem. at 8). In support of this view, the preface to the Bumbershoot Supplemental Clauses indicates that the terms contained therein "supercede any inconsistent Policy provisions," (Jt. Ex. 22), and the "Conditional Exclusions" section reads:

> "As respects all activities of the Assured (except liability arising *out of ownership, charter,* use, operation, maintenance, loading, unloading or as a bailee of any watercraft *not otherwise excluded or limited herein* ), this insurance shall be free from liability (unless coverage is provided in an underlying policy scheduled hereon, and then coverage hereunder shall only operate as excess of such coverage)." (Jt. Ex. 225) (emphasis added).

One interpretation of the "Conditional Exclusions" provision is that it establishes that the insurers will indemnify the assureds for disagreements stemming from a charter dispute, as long as these disagreements are *"not otherwise excluded or limited"* by the language of the Policy. Under this reading, since the definition of "Property Damage" in the policy excludes property owned by the assured, the assured would not be covered for damage to his own property even when it is involved in a charter dispute. Indeed, this seems the most straightforward reading of the policy.

However, another interpretation of this clause places more emphasis on the Bumbershoot Supplementary Clauses' preface, which states that all bumbershoot provisions "supercede any inconsistent policy provisions." Under this reading, the

---

lars of indemnity coverage, as opposed to the $100,000 figure erroneously indicated in the

actual policy.

"Conditional Exclusions" section is read to bind the insurer regardless of other stated exclusions in the policy, thus making any charter agreement dispute covered under the policy, regardless of who owns the chartered property. In the court's view, both of these interpretations are reasonable, and therefore the policy terms are ambiguous. *See USX Corp.*, 2000 WL 636912 at *9; *Prudential Lines* 158 F.3d at 77. In light of this ambiguity, the court turns to extrinsic evidence to determine the clauses' meanings.

Plaintiffs next argue that a finding that the vessel's damage was normal "wear and tear" bars defendants from asserting a claim under the policy because occurrence-based policies like the one at bar have never been construed to cover the assureds' costs for maintaining his own property. *See Royal Insurance Co., v. Ru–Val Electric Corp.*, 1996 WL 107512, *1 (E.D.N.Y. Mar.8, 1996) (interpreting the term "occurrence" in a CGL builders' policy); *Prudential Lines*, 158 F.3d at 80–81 (explaining that an occurrence-based P & I marine policy covers "condition[s] which result in property damage neither expected nor intended from the standpoint of the insured"); *Michaels v. City of Buffalo*, 85 N.Y.2d 754, 759, 628 N.Y.S.2d 253, 651 N.E.2d 1272 (1995)(defining "occurrence" in an automobile policy as an unintended event or a sudden catastrophe).

■ Precedent can assist the court in determining the "reasonable expectations" the assured had about a policy's coverage. *See, e.g. Royal Insurance Co.*, 1996 WL 107512 at *1. However, the cases plaintiffs cite involve different kinds of insurance coverage (*e.g.* P & I, CGI), and some involve different subject matters (*e.g.* automobile risk, construction risk). The court cannot presume that assureds understood the term "occurrence" to cover the same kinds of accidents across all of these areas. *See Sunbeam Corp. v. Liberty Mutual Ins. Co.*, 740 A.2d 1179, 1184–85 (Pa. 1999)(explaining that boilerplate terms may be construed differently in different subject ar-

eas); 9 Couch On Ins. § 126:29 (3d ed. 1999) (noting that parties can contract for different meanings of the term "occurrence"). Additionally, the term "occurrence" in this case is being construed in the context of a drop down provision, and this court has indicated that the term has a much broader meaning in this context than the one plaintiffs urge. *See Pacific Resources*, 1984 WL 928 at *2 (explaining that the meaning of occurrence in a drop down provision "is broad[,] consistent with the purpose of the Bumbershoot policy—to cover any unforeseeable loss not covered by the assured's other insurances.")

Plaintiffs next offer more specific evidence that the trade definition of "occurrence" in marine insurance drop down provisions refers only to accidents that inflict harm on third parties' property, and does not refer to wear and tear damage to the assureds' own property. Plaintiffs offered expert testimony from Brendon Tully, a self-employed insurance consultant with thirty one years experience in brokering and underwriting in the marine insurance field. (Tr. at 391). Tully testified that he had dealt with the standard form marine bumbershoot policy used in this case since 1964, and that the policy was generally interpreted to cover P & I risks, that is, accidental torts on third parties. (Tr. at 392–94). In specific, he indicated that the term "occurrence" in the policy, whether in a drop down or excess insurance provision, would only be interpreted to cover an accidental injury to another's property, and would not provide indemnity for "wear and tear" damage to the assureds' property. (Tr. at 399, 404). This understanding of the policy was consistent with the interpretation offered by the subscribing underwriters who testified at trial. Defendants, in contrast, produced no expert to support an alternate reading of the policy.

The facts surrounding the calculation of the bumbershoot policy premium also indicate to the court that the policy was intended only to cover the damage the assureds inflicted on third parties' property.

*See Navigators Insurance Co.,* 1999 WL 681161 at *10; *Continental Grain Company v. Fireman's Fund Ins. Co.,* 1997 WL 86392 at *3 (S.D.N.Y. Feb.27, 1997) (Duffy, J.). Specifically, Reliance underwriter Morency set the bumbershoot policy premium using a percentage of the standard premiums for Terminal Operators, Contingent Marine Liability, Comprehensive General Liability and Automobile policies. (Tr. at 57–58). These insurance lines all indemnify the assured for damage he inflicts on third parties' property; none offer indemnity for first party property damage. *See e.g.,* Hayden & Balick, *Marine Insurance,* 66 Tul. L.Rev. at 322, 341 (describing various classes of marine insurance).

Indeed, both the expert testimony and the premium calculated in this case indicate that the defendants purchased drop down coverage for injuries they inflicted on third parties' property. Based on this finding the court concludes that the term "occurrence" in the instant policy does not cover the first party property damage at issue in this dispute, and therefore plaintiffs are not obligated to indemnify defendants for the vessel's damage.

At this juncture, defendants alter their argument, and contend that the damage to the vessel is a P & I "occurrence" because their sale of the vessel damaged a third party: NEP. There is some basis for constructing their claim in this manner. *See Pacific Resources,* 1984 WL 928 at *2. In *Pacific Resources,* the court interpreted a seemingly identical marine insurance bumbershoot policy with drop down coverage, and held that the assured was indemnified under the policy for damage he caused to a charterer, after he sold a defective ship to another party, and the ship sank while transporting the charter's goods. The *Pacific* Court explained that the sale of the ship was an "occurrence" and that the loss of the charterer's property was property damage. *See Pacific Resources,* 1984 WL 928 at *2. In this case, however, there was no showing that defendants' sale of the ship to NEP caused another third party to be harmed. Rather, NEP, the purchaser, was harmed by the sale of the vessel, and the only harm they suffered was that they had to repair the defective vessel and withstand lost profits while the vessel could not be used. It is clear that these lost profits are not what is intended by term "Property Damage" as defined by the policy. *See Clause* IV(2) (explaining that property damage is "tangible property" damage).

Even if the court concluded that plaintiff's sale of the damaged vessel was a P & I "occurrence," there is extensive evidence in this case showing that the parties did not anticipate that the policy would cover any P & I risks from the charter agreement. All of the parties' actions during the policy renewal negotiations indicated that the charter agreement was not covered under the bumbershoot policy. *See Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mutual Ins. Co.,* 641 F.Supp. 297, 309 (E.D.Pa.1986). Specifically, Gallagher indicated in the policy application that the charter agreement was covered by defendants' P & I primary insurance, and she never altered or corrected this representation.[8] Also, it is clear that Morency did not believe that Reliance was negotiating for a P & I policy that would cover charter agreement liabilities, as he calculated the bumbershoot premium to cover all the P & I liabilities not covered by defendants' underlying insurances, but did not include any potential risks from the charter agreement. (Tr. at 57–58). These facts together indicate that the parties did not believe that the drop down provisions' emergency coverage for uninsured P & I risk would include charter agreement liabilities, and are fatal to defendants' claim.

**8.** Sedgwick employees' actions are evidence of defendants' intent as these employees acted as defendants' agents in the transaction. *See Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mutual Ins. Co.,* 641 F.Supp. 297, 303–04, 309 (E.D.Pa.1986); 3 Couch on Insurance 3d § 45.4.

The court in *Rich Maid* emphasizes the importance of binding parties to their mutually shared understanding at the time they entered an insurance policy:

> Just because [the assured], . . . determines that the words of [a] policy are ambiguous months after the policy has been renewed . . . should not change the mutual intent of the parties. One party should not receive a windfall based on a term not bargained for in the agreement merely because the written words of the agreement could, by an outside observer, have more than one meaning.

*Rich Maid*, 641 F.Supp. at 310. This principle rings equally true in this case.

In summary, plaintiffs have shown that the standard use of the word occurrence in a marine bumbershoot policy with drop down coverage refers to damage the assured inflicts on a third party, and therefore defendants' claim for first party property damage is not covered under the policy.. Plaintiffs have also demonstrated that the parties did not alter the definition of occurrence in their negotiations to cover first party property damage, nor did they contract to cover liabilities arising out of the charter agreement. In light of these findings, the court holds that the vessel's damage costs are not covered under clause 1(c)(ii) of the policy and issues judgment in plaintiffs' favor.[9]

### D. Claims Against Third Party Defendant Sedgwick

The final question before the court is whether Sedgwick, through negligence or affirmative misrepresentation, breached its duty to disclose material facts while negotiating plaintiffs' subscription to the bumbershoot policy. (Pl. Mem. at 73)(citing *Auto–Owners Ins. Co. v. Johnson Rast & Hays Ins. of South Alabama*, 820 F.2d 380 (11th Cir.1987)). Plaintiffs contend that Sedgwick's breach of this duty of disclosure requires that Sedgwick be bound to indemnify plaintiffs if they are ultimately required to indemnify defendants for the costs of repairing the vessel's damage and the related NEP settlement. (*Id.*) The court's conclusion, that the policy does not offer defendants coverage for the vessel's damage and the NEP settlement costs moots plaintiffs' claim for indemnification.[10] Therefore, this claim is dismissed.

9. Defendants also claim that plaintiffs are liable under Pennsylvania's bad faith insurance statute, *See* 42 Pa. Cons. Stat. Ann. 8371, which provides assureds with a cause of action for an insurer's "refusal, with no good cause, to provide a defense or to indemnify when the policy provides for coverage." *See Frog, Switch & Man. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n. 9 (3d Cir.1999). An assured has a claim under the statute when his insurer acts in bad faith when refusing his claim. *Id.* Bad faith is defined as a "frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured." *Id.* (collecting cases).

The court's conclusion that plaintiffs had no obligation to indemnify defendants for the Charter Agreement settlement establishes that defendants have no claim under the Pennsylvania bad faith insurance statute as well, because the determination that defendants were not entitled to coverage under the Policy establishes that the insurers had good cause to refuse coverage.

10. The case plaintiffs cite in support of their claim for indemnification, *Auto–Owners Insurance Company v. Johnson Rast & Hays Insurance of South Alabama*, 820 F.2d 380 (11th Cir.1987)), concerns an underwriter's state law claim against a broker for his failure to fully disclose the insured's potential liabilities. In contrast, the duty of disclosure for marine insurance brokers is controlled by a distinct admiralty rule. Often referred to as the duty of uberrimae fidei, or the duty of utmost good faith, in the instant case this duty would have required Sedgwick to disclose to the underwriters all "material facts" about defendants' potential liabilities, that is, facts that would affect the pricing of the assureds' premium or the insurers' decision to provide the assureds with coverage. *See, e.g., Anne Quinn Corp. v. Am. Mfrs. Mutual Ins. Co.*, 369 F.Supp. 1312, 1315–1316 (S.D.N.Y.1973) (Bonsal, J.) (discussing the duty of utmost good faith); 6 Couch on Ins. § 81:21 (3d ed. 1999). The underwriter's remedy for a broker's breach of this duty is to allow the underwriter, ab initio, to void the policy. Since the court has concluded that the bumbershoot policy in this case does not provide coverage for the vessel's damage and the related NEP settlement costs, there is no need for this remedy in this action.

## SUMMARY

In summary, the court grants plaintiffs a declaratory judgment, establishing that clause 1(c)(ii) of the bumbershoot policy does not require them to indemnify defendants for the costs of repairing the vessel's damage or the NEP settlement. Defendants' cross-claims for declaratory relief establishing their right to indemnity under the policy are denied. This decision has mooted plaintiffs' claim against third party defendant Sedgwick and, therefore the claim against Sedgwick is dismissed.

## IT IS SO ORDERED